Argued November 18, reversed and remanded December 9, 1953

STATE OF OREGON *v.* BOUSE

264 P. 2d 800

*Randolph Slocum* and *John H. Horn,* of Roseburg, argued the cause and filed a brief for appellant.

*Robert M. Stults,* of Roseburg, argued the cause for respondent. With him on the brief was Warren A. Woodruff, of Roseburg.

TOOZE, J.

The defendant, Thomas Sylvanus Bouse, was convicted in the circuit court for Douglas county, Oregon, of the crime of murder in the first degree, and was sentenced to death. He appeals.

The indictment charging defendant with the crime of murder in the first degree, omitting formal parts, alleges:

"The said Thomas Sylvanus Bouse on the 8th day of October, A. D. 1952, in the said County of Douglas and State of Oregon, then and there being did then and there unlawfully and feloniously, purposely and with deliberate and premeditated malice, kill one Ethel Loucile Bouse by drowning said Ethel Loucile Bouse in a bathtub * * *."

Ethel Loucile Bouse died sometime during the forenoon of October 8, 1952, as the result of drowning. She was the wife of defendant, the couple having been married for more than twenty years continuously immediately prior to Mrs. Bouse's death. The parties, together with two of their children, Virginia, age 17, and Jane, age 7, resided at 726 South Pine street in Roseburg. For a considerable period of time immediately preceding her death, Mrs. Bouse had been regularly employed as a waitress at the Umpqua hotel in Roseburg, her working hours being from noon until 8 p.m. of each day. Virginia attended high school, but commencing at 4 p.m. each day after school, she did part-time work in a store.

On the evening of October 7, 1952, after working hours, Mrs. Bouse and Virginia attended a show in Roseburg, arriving home about 10:30 p.m. While Mrs. Bouse did some family washing, Virginia and the

defendant visited for approximately an hour. Mrs. Bouse was still working when Virginia and defendant went to bed. It was her custom to do such work during night hours.

On the morning of October 8, 1952, defendant awakened Virginia and sent her to school. Upon telephoning her mother's place of employment after school, as was the practice, Virginia learned that her mother had not been at work that day. She then telephoned the family residence, and her father answered the telephone. According to her story, he told her: "Well, I have done something terrible. You had better call the police."

The police were called, and they arrived at the Bouse home about 5:15 p.m. They found the body of Mrs. Bouse lying on its back, "its head to the south toward the kitchen and the head seemed to be bent in a position back; the knees were elevated, with the left knee touching the outer edge of the bathtub—the outer surface of the bathtub." The body showed no recent bruises or injuries, nor was there any evidence indicating a struggle. Decedent was wearing a two-piece pajama set, with the legs rolled up above the knees, which was not torn in any part; her hair was pinned up in very tight curls, and was in no way disarranged.

The bathtub contained water to a depth of 8½ inches. There was a great amount of blood in the washbowl and toilet and upon the bathroom floor. Although spots of blood were found on decedent's pajamas, they were not of her own blood.

Defendant was found in a state of shock from the loss of blood. He had a cut on his throat and on his left wrist, both of which had bled freely. He was immediately taken to a local hospital by ambulance.

An autopsy performed upon the body of Ethel Bouse that same evening disclosed that she had suffered death as the result of drowning. No bruises or other evidence of recent injury to the body was revealed.

The indictment against defendant was returned on November 12, and he was arraigned on November 15. In the meantime, the trial court had advised two young and inexperienced Roseburg attorneys that they would be appointed to represent the defendant. They appeared for defendant at the time of arraignment. Defendant entered a plea of "not guilty", and at the same time, written notice was given that he would show in evidence that he was insane or mentally defective at the time of the commission of the alleged crime, pursuant to the provisions of § 26-846, OCLA.

The trial commenced on December 1, 1952, and terminated on December 5, 1952, with a verdict of "guilty of murder in the first degree" without recommendation. On December 17, 1952, defendant filed his motion for a new trial, based upon alleged errors in law which occurred during the trial, and which, he asserted, denied his constitutional right to a fair and impartial trial. The trial court denied the motion for a new trial.

■■ Art. 1, § 11, Oregon Const., guarantees to an accused person in criminal proceedings the right to be heard by counsel. The federal constitution contains a similar guarantee: Amendment VI, U. S. Const. This constitutional right to be heard by counsel is a substantial and valuable right. It is not satisfied by a mere token regard for the constitutional provision. In the interests of justice, a trial court should never appoint inexperienced counsel to represent a defendant

in a capital case. The rule is stated in 14 Am Jur 888, Criminal Law, § 174, as follows:

"In appointing counsel the court should act in such a way that both the individual and the state will be impartially protected. It is the duty of the court to see that counsel is assigned having sufficient ability and experience fairly to represent the defendant, to present his defense, and to protect his rights. *Where it appears that the rights of the accused were not properly safeguarded, a conviction should be reversed.*" (Italics ours.)

In their brief filed in this court on behalf of· defendant, counsel, with commendable frankness, admit that they lacked the criminal trial experience necessary to safeguard properly the accused's rights on the trial of this case, and claim that, because thereof, defendant did not have the fair and impartial trial that the law contemplates.

The conduct of the trial, the failure to make timely objections, or to take proper exceptions completely demonstrate such inexperience on the part of counsel. The record is replete with instances of improper and · prejudicial questions and answers and exhibits admitted as a part of the State's case, all without objection on the part of defendant's counsel. Counsel contend that the prejudicial errors committed on the trial are palpable errors and that we should take notice thereof even though they made no objections and saved no exceptions. It is a general rule that it is only error which is legally excepted to that can be reviewed upon an appeal, but this rule, like most general rules, has its exceptions. Where the record, considered in its entirety, shows that a defendant has not had the kind of trial contemplated by the law, this court will take cognizance of a palpable error occurring on the trial,

although it was not expected to. *State v. Nodine,* 198 Or 679, 259 P2d 1056, 1059; *State v. Moore,* 194 Or 232, 241 P2d 455; *State v. Pace,* 187 Or 498, 212 P2d 755.

■ Art. 1, § 11, Oregon Const., guarantees to every accused person a fair and impartial trial. Due process under the provisions of Art. 1, § 10, Oregon Const., and Amendment XIV of the federal constitution demands such a trial. The constitutional right to a fair and impartial trial and due process also requires that the trial proceed according to the established procedure or rules of practice applicable; that the admission of evidence for or against the accused must be according to the established rules as to competency. 14 Am Jur 849, Criminal Law, § 120; 16 CJS 1181, Constitutional Law, § 589.

■ The constitutional right to a fair and impartial trial is a fundamental right. It applies to all persons; to the guilty as well as to the innocent. The duty of seeing that this right of an accused person is protected and preserved inviolate falls squarely upon the shoulders of the judiciary. In the first instance, it is the duty of the trial court, but when it fails in the performance thereof, it then becomes the duty of this court. As an appellate court, we are concerned only with questions of law in a case such as this; we do not retry the facts. The guilt or innocence of an accused person is a matter exclusively for jury determination. But where a verdict of guilty has been returned on a trial where there has been error at law committed that is prejudicial to the rights of the accused, the verdict cannot stand as a matter of law. In 16 CJS 579, Constitutional Law, § 199, it is stated:

"The courts must ever be watchful to protect the personal rights guaranteed by state and federal

constitutions. Constitutional rights cannot be made dependent on the favor of the court, but may be asserted as a matter of right.

"* * * * *

"Constitutional guaranties pertaining to personal rights are available to all alike and should not be withheld in the slightest degree even from those under suspicion of violating the law."

It was the State's theory on the trial that defendant murdered his wife by forcibly holding her head under water in the bathtub until she drowned. Aside from some testimony respecting the mental condition of defendant, the principal contention urged in his defense was that decedent wished to commit suicide, and that he, the defendant, merely assisted her toward that end. There was considerable testimony offered by the State as to oral admissions or confessions made by defendant following his wife's death. This testimony formed the principal basis for the charge of murder in the first degree.

We shall now review some of that testimony.

Roy Hebard, a neighbor, went to the Bouse home about 5 p.m. on October 8. He testified as follows:

"Q Now, just what did you do when you got to the Bouse home?

"A I went over and knocked about four times and finally Tom answered. He said, 'Come in.' I tried the door; it was locked. He came over and unlocked the door and I asked him, I says, 'Is there anything wrong, Tom?' I noticed a slash on his wrist. He says, 'Yes.' He says, 'I have done it.' He says, 'You might as well call the police and have them come and get me.' I followed him on in the room. He led me in and then I noticed Ethel laying on the floor by the bath tub. I could just see her

head from where I stood but I didn't go any farther.''

William Burke, a patrol sergeant of the Roseburg police department, arrived at the Bouse home about 5:30 p.m. He was accompanied by police officer Carl Smith. Burke testified:

"Q When the door was opened, who did you see?

"A I didn't see anybody at first. He was standing behind the front door. The front door opened inward and he was standing behind the door. I inquired as to what the trouble was and a voice invited me in. I opened the screen door and stepped inside and I again asked him what the trouble was and he replied that she is in the bathroom. 'I finally did it.'

"Q Who was that person?

"A He was later identified as the defendant, Mr. Bouse.

"'* * * * *

"Q Now, what were his exact words?

"A As I recall, as he stepped out from behind the door, he said, 'She is in the bathroom. I finally did it.' ''

James D. McAlpine, a police officer, testified to a conversation between defendant and Vernon Perry, office manager of the hospital to which defendant had been taken, occurring during the evening of October 8, as follows:

"Q COURT: Who did you say you heard talking?

"A I overheard Vernon Perry asking the defendant a few questions.

"Q What did he ask him, Mr. McAlpine?

"A He asked him, 'Did you put your wife in the bath tub?' and the defendant answered, 'I put her in the bath tub and held her under the water.'

And he asked the defendant, 'Did she struggle?' and the defendant answered, 'A little. She was easy to hold down. She was tired of living. She had said so many times.' "

McAlpine also testified that he asked defendant the question, "have you had trouble with your wife?" to which defendant replied: "We have been into it for a long time. She isn't here any more."

State police officer Joseph A. C. Haystead went to the Bouse residence at 6:10 p.m. on October 8. Prior to his arrival, defendant had been removed to the hospital. Later that evening at the hospital, Haystead questioned defendant. As a witness on direct examination, he related the interview as follows:

"Q Would you please tell to the members of the jury his statements concerning how his wife had died, please?

"A I asked the subject if he wanted to talk about it and he said he did, and I told him that he didn't have to make any statement but he said he wanted to tell about it and I also advised him at that time that we would like to make a record of his statement; I had a wire recorder there and explained it to him, and that was agreeable with him and that was done. He told me that him and his wife had not been getting along for a long time.

"COURT: Was the defendant telling you?

"A Yes, sir.

"Q You were talking to him?

"A Yes, sir. He stated that he and his wife had been having trouble for over a long period of time and that they had awakened on the morning of the date of the crime, the alleged crime, and that no one was mad at anyone that morning. He said,—I started to question him and he started talking and it came freely, so I allowed him to talk and didn't ask any further question as he told the story. He

said that she had told him that she was tired and wanted to die; she told him that twice. He said it wasn't hard; he did it with one hand; that he held her under the water and said 'I watched the clock, it took 10 minutes for her to die.' He said then he tried to make an attempt on his own life and he turned to me and said, 'Now, you know how I did. that.' I asked him the question of how that was done and he said, 'By cutting my wrist and my throat and I also attempted to put my head and hold it under the water but I couldn't do it. I wasn't able to do it that way.'

"Q Did he make any statement concerning his mental condition at that time?

"A He told me, he said, 'you might think that a person has to be crazy to do such a thing but' he said, 'I am not insane and I wasn't insane. I have my mind right now just as I did when I was a small child.'

"Q Did he make any statement as to how easy or difficult it was to kill himself?

"A He said it was hard; that he just couldn't do it.

"Q Did he tell you at what time he killed his wife in the water in the bathtub?

"A At ten minutes past ten.

"Q And did you ask him concerning what time he attempted to take his own life?

"A Yes.

"Q What did he say?

"A Shortly after.

"Q Now, were there any offers of immunity or reward held out to the defendant to make this statement?

"A There were none.

"Q Did he give it freely and voluntarily?

"A He did.

"Q At the time was he alert and seemed to know what was going on?

"A He seemed to be very quiet but in good spirits.

"Q Did he answer your questions when asked?
"A Very readily."

Upon cross-examination, Haystead further testified:

"Q And that he stated to you that no one was mad at the time. Did he state to you any reason for doing this?
"A He didn't state no one was mad at the time; he said no one was mad, not this morning. Those were his words as I best remember them.

"Q You are sure that he said to you that she told him twice 'I am tired and I want to die.' That she told him that twice?
"A No, she said, 'I am tired; I wish I were dead.'

"COURT: You mean that is what this man Bouse said?
"A That is what Mr. Bouse said to me.

"Q Did his statements appear to you to be entirely true and did you think he was telling the truth at the time?
"A I believe he was telling the truth.

"Q You think he was telling the truth as to these statements?
"A I do.

"* * * * *

"Q Were there any more questions asked other than those you testified to?
"A Only two questions by the district attorney.

"Q What was the nature of those questions?
"A The district attorney asked Mr. Bouse 'When did you decide to kill her?' And his reply was 'This morning, when she asked for it.'

"Q What was the other question asked?
"A I believe the other question concerned whether or not he attempted to, the attempt on his life was made by cutting his throat or his wrist first and I believe he answered that he had cut his throat first and then his wrist."

Dean Allen Davis, Roseburg police officer, stood guard over defendant at the hospital. On his direct examination as a witness, he testified in part as follows:

"Q Would you tell the members of the jury, please, what the defendant told you concerning that?

"A He stated that the defendant, that when he got up that morning and filled the bath tub, that his wife was standing there and he placed both hands on her shoulders and pushed her over the tub backwards and with one hand around her throat, held her under and worked his hand up on her face and held her under for the rest of the time she was there and he stated that she only thrashed around a little bit at the first and then at the last.

"Q Did he say how long he thought he held her under the water?

"A Ten minutes.

"Q And, did the defendant give any reason for having committed this act?

"A He gave the reason that she was always claiming that she was tired and that she wanted to die and have it over and he agreed.

"Q Now, did he make any statement concerning when he told her he was going to kill her?

"A Yes, he made the statement that he was going to kill her earlier in the morning—that he was going to kill her earlier in the morning and then he changed it, changed the statement and said that it wasn't too long before he killed her that he had decided on it."

The witness stated on cross-examination:

"COURT: What Mr. Horn wants to find out from you is this: You said something about a suicide pact.

"A Oh, that she was tired all the time and they agreed they both would die together and he agreed to kill her."

Defendent's requested instruction No. 10 was based upon § 23-407, OCLA, which reads as follows:

"If any person shall purposely and deliberately procure another to commit self-murder, or assist another in the commission thereof, such person shall be deemed guilty of manslaughter."

The instruction was in the words of the statute. After the trial court had finished its instructions to the jury, its failure to give defendant's requested instruction numbered 10 was called to its attention. Thereupon, and before the jury retired for deliberation, the court gave that instruction.

■ Some time later the jury returned to the courtroom where the following proceedings occurred:

"COURT: Now, I have already instructed this jury as to all the principles of law governing this case. I cannot determine any questions of fact for you, as I explained to you. The facts are entirely for your determination under the principles of law which I gave to you. The bailiff brought up to me a writing here. It appears that somebody has a question and the first question submitted here is: *In what degree did the deceased have to contribute in order to make her a participant in the crime? Is there somebody that wants that question answered?*

"MR. MARSH: Yes, I do, Your Honor.

"COURT: The answer to this question is: *There is no evidence in this case of participation by the deceased in the crime.* Now, there is a further question submitted: *Would the fact that she—I suppose that means the decedent—stepped out with another man and suggested to him—I assume that means the defendant—that she would like to die make her a contributor to the act?* Is there somebody that wants an answer to that question?

"MR. MARSH: The same question.

"COURT: *The same answer.* Take the jury back to the juryroom.

"MR. MARSH: Your Honor, could we have number 10? I would like to have it read again—the statement, number 10, which was read just before going to the juryroom.

"COURT: By reading you that instruction, I did not mean to suggest and do not suggest what the facts may be. The instruction number 10 is to this effect, but it should be taken into consideration with all other instructions given: The law provides that if any person shall purposely and deliberately procure another to commit self-murder, or assist another in the commission thereof, such person shall be deemed guilty of manslaughter. *There is no evidence in this case that any person deliberately procured another to commit self-murder or assist in the commission thereof.* You may retire.

"MR. SLOCUM: Your Honor, I would like to note an exception.

"COURT: You may have your exception—to what—

"MR. SLOCUM: To the fact there was no evidence that there may have been a solicitation or an agreement between the defendant and the decedent to commit suicide or a suicide pact." (Italics ours.)

The principal contention of defendant in this court is that the trial court erred in telling the jury that "there is no evidence in this case of participation by the deceased *in the crime.*" (Italics ours.)

This statement by the court constituted error in two respects: (1) It erroneously assumed that someone (other than deceased) had committed a crime, the very fact in dispute on the trial, although this error would not be reversible in this case; and (2) there was some evidence in the record from which the jury might have found that deceased participated in bringing about her own death.

Not that this evidence of participation on the part of deceased in bringing about her own death, if believed, would necessarily reduce defendant's crime, if he committed a crime, to manslaughter, but it might well have a bearing upon the punishment to be inflicted upon him in case of his conviction of the crime of murder in the first degree.

Under the provisions of Art. 1, § 37, Oregon Const., the jury in a capital case is given the authority to recommend life imprisonment for one convicted of the crime of murder in the first degree. If no recommendation is made, then death is the mandatory penalty.

■ In the light of this constitutional provision, a defendant on trial for the crime of first-degree murder is entitled to have the jury consider all mitigating and other circumstances of the case in its consideration of the penalty to be imposed upon conviction. It also is the duty of the trial court to keep from the jury all immaterial and prejudicial evidence, such as testimony respecting other offenses (unless clearly admissible), so that the jury may not be improperly influenced in considering its verdict and recommendation. The applicable rule is well stated in *Winston v. United States,* 172 US 303, 313, 19 S Ct 212, 43 L ed 456, as follows:

"* * * The authority of the jury to decide that the accused shall not be punished capitally is not limited to cases in which the court, or the jury, is of opinion that there are palliating or mitigating circumstances. But it extends to every case in which, upon a view of the whole evidence, the jury is of opinion that it would not be just or wise to impose capital punishment. How far considerations of age, sex, ignorance, illness or intoxication, or human passion or weakness, of sympathy or clemency, or the irrevocableness of an executed sentence of death, or an apprehension that explanatory facts may

exist which have not been brought to light, or any other consideration whatever, should be allowed weight in deciding the question whether the accused should or should not be capitally punished, is committed by the act of Congress to the sound discretion of the jury, and of the jury alone."

Also see *State v. Bailey,* 179 Or 163, 181, 170 P2d 355; *State v. Folkes,* 174 Or 568, 638, 150 P2d 17 (dissenting opinion).

The evidence in this case most damaging to defendant consisted of the testimony respecting his alleged oral admissions. Those admissions, in addition to containing much that was adverse to defendant, also contained certain statements of exculpatory and mitigating circumstances favorable to him.

The statements claimed to have been made by the defendant were admitted as a whole. The jury was entitled to believe any part or all thereof, both that which adverse as well as that which was favorable to defendant. In his memorandum opinion denying defendant's motion for a new trial, the trial judge stated:

"Aside from the testimony of one Doga Birgit Matilda Whitley to the effect that the deceased, Ethel Bouse, was tired of living and wanted to die, the only other testimony relative to such matter was the testimony of the officers of statements made by the defendant to substantially the same effect. *The testimony of the officers to the effect that Bouse made such statements is not evidence of the fact as to whether or not Ethel Bouse was tired of living and wanted to die but is only evidence that Bouse made such statements to the officers.*" (Italics ours.)

In this conclusion the trial court erred. The statements did constitute some evidence of what a jury

might have found to be mitigating circumstances favorable to defendant. The weight to be accorded such evidence was entirely a matter for jury determination.

In 22 CJS 1266, Criminal Law, § 735, the following rules are stated:

"While evidence of an admission, if complete, is not to be excluded because the witness called to prove it did not hear or because the witness called to prove it did not understand or remember the whole conversation, and the state is not required to prove the entire conversation or writing in which the admission was made, yet, *where the transaction, writing, or conversation is an entire and connected one relating to the same subject matter, the whole of it is admissible, and, where the state has proved part, accused is entitled to prove the remainder, even though it is in his favor, as where it comprehends his explanatory, exculpatory, or self-serving declaration;* * * *." (Italics ours.)

In 2 Wharton, Criminal Evidence 11th ed, 961, § 581, it is said:

"* * * And it should be noted that a confession, though embodying an exculpatory statement, or though connected therewith, may not be inseparably or distinctively of that nature. In such case, the confession is admissible, and it is for the jury as the trier of the facts of the case to determine what weight should be given to the inculpatory part of the confession, and what weight should be given to the part tending to exculpate the confessor."

In *Burnett v. People,* 204 Ill 208, 225, 68 NE 505, 98 Am St Rep 206, 66 LRA 304, the Illinois Supreme Court held as error on the part of the trial court its refusal to give the following requested instruction:

"The court instructs the jury that, where a confession of the prisoner charged with a crime is of-

fered in evidence, the whole of the confession so offered and testified to must be taken together, as well that part which makes in favor of the accused as that part which makes against him; and if the part of the statement which is in favor of the defendant is not disproved by other testimony, and is not improbable or untrue, considered in connection with all the other testimony of the case, then that part of the statement is entitled to as much consideration from the jury as the parts which make against the defendant.''

Also see *State v. Laliyer*, 4 Minn 368, 4 Gilfillan 277; *State v. Young*, 119 Mo 495, 24 SW 1038.

 Moreover, the jury was not required to accept as true the testimony of the officers, or of anyone else, that defendant actually made the statements attributed to him. The jury had the right to accept or reject the testimony that defendant said he had held his wife's head under the water until she died. All this testimony related to alleged oral admissions of defendant. Such testimony is always to be viewed by a jury with caution, and in each case when applicable, the trial court is required by statute so to instruct. § 2-1001 (4) OCLA; § 5-308, OCLA; § 26-921, OCLA. The reason for this rule is obvious. A party making an alleged oral admission may have been misinformed or may not have clearly expressed his meaning, or the witness testifying thereto may have misunderstood him; or it may be that the witness who testifies to the admission, by intentionally or unintentionally altering a few of the expressions really used, gives an effect to the statement completely at variance with what the party actually did say. On the other hand, if the jury believes from the evidence that the alleged admissions were clearly and understandingly made by the party, that they have been precisely identified and that the language used

is correctly remembered and accurately reported by the witness, it is entitled to consider them for what it may deem them to be worth against the party making them. In this case the trial court instructed the jury that the oral admissions of a party were to be viewed with caution as required by the statute, but it did not elaborate upon the statutory instruction by explaining the reason for the rule. In a case as serious as that before the court such an explanation would be helpful. Defendant's conviction in this action rests largely upon the testimony as to these alleged oral admissions, although there were other facts and circumstances in the case wholly apart from the admissions from which the jury might have found the defendant guilty. However, in the absence of these alleged admissions, the evidence might have suggested to the jury that decedent had committed suicide without active assistance from defendant. The absence of all evidence of struggle, the condition of decedent's pajamas and her hair when her dead body was found would lend some color to the theory of suicide, or at least to a claim of participation in the alleged crime of deceased. Defendant did not testify on the trial, but his plea of "not guilty" was a denial of, and put in issue, every material fact in the case tending to establish guilt. The jury, being the sole and exclusive judges of the credibility of all witnesses and of the weight and value of all evidence in the case, could have rejected entirely the testimony as to the alleged oral admissions of defendant. It is not for the court to say as a matter of law that the jury would or would not have been justified in so doing.

The testimony respecting the oral admissions of defendant came within the meaning of § 2-228, OCLA, which provides that "evidence may be given on the trial" of the following facts: "(2) The declaration,

act, or omission of a party as evidence against such party."

However, the testimony of state police officer Haystead related to an oral extrajudicial confession of defendant, rather than to a mere declaration against interest. There is a distinction between admissions and declarations admissible under § 2-228 (2), OCLA, and confessions within the meaning of § 26-937, OCLA, which reads as follows:

> "A confession of a defendant, whether in the course of judicial proceedings or to a private person, can not be given in evidence against him, when made under the influence of fear produced by threats; nor is a confession only sufficient to warrant his conviction, without some other proof that the crime has been committed."

■ A different rule applies respecting the admission of confessions in evidence from that applying to testimony concerning oral admissions. Before testimony as to an alleged "extrajudicial confession" is admissible, it must be first shown that the confession was voluntary on the part of accused and was not induced by hope of reward or fear. A confession which is actually or practically an acknowledgement of guilt is prima facie involuntary, and the state has the burden of showing it was not induced by threats or promises of favor. *State v. Howard*, 102 Or 431, 452, 203 P 311.

■ The admissibility of a confession is in the first instance a mixed question of law and fact for determination by the trial judge. On the offer of accused's confession, the court must first determine as a preliminary matter whether it was voluntary and not made under the influence of hope or fear. Although we have held that it is not necessarily reversible error for this preliminary investigation to be held in the

presence of the jury (*State v. Spanos,* 66 Or 118, 134 P 6), yet, for obvious reasons, the better practice is that it be conducted in the absence of the jury. The defendant has the right to be heard upon this preliminary investigation without waiving any of his other rights on the trial. He may offer evidence to rebut that of the state which tends to show that the confession was voluntary. If the court determines from its preliminary investigation as a matter of fact and of law that the confession was voluntarily made within the meaning of § 26-937, OCLA, supra, then it, together with all testimony affecting its voluntary character, is admissible in evidence. However, this determination by the trial court is not final. In the final analysis, it is for the jury to determine whether or not the confession was voluntarily made within the meaning of the statute. If they are not satisfied from the evidence that it was a voluntary confession, then they not only have the right, but it is their duty, to reject the confession in its entirety as any part of the evidence on the trial and to determine the guilt or innocence of the accused from the other facts and circumstances of the case. There has been no contention made in this court that this confession was not voluntary. Testimony respecting oral confessions of an accused is to be viewed by the jury with the same caution applying to testimony as to oral admissions. *State v. Green,* 128 Or 49, 273 P 381; *State v. Weston,* 102 Or 102, 201 P 1083; *State v. Rathie et al.,* 101 Or 339, 199 P 169, 200 P 790; *State v. Stevenson,* 98 Or 285, 193 P 1030; *State v. Morris,* 83 Or 429, 163 P 567; *State v. Spanos,* supra; *State v. Humphrey,* 63 Or 540, 128 P 824; *State v. Garrison,* 59 Or 440, 117 P 657; *State v. Roselair,* 57 Or 8, 109 P 865; *State v. Blodgett,* 50 Or 329, 92 P 820; 22 CJS 1468, Criminal Law, § 838.

It also is noted that the court did not remove from the jury's consideration instruction numbered 10, based upon the provisions of § 23-407, OCLA, supra. In fact, the instruction was repeated. Having let the instruction stand, the court, nevertheless, told the jury "there is no evidence in this case that any person deliberately procured another to commit self-murder or assist in the commission thereof." This statement by the court was contradictory to the instruction, and it is manifest that it was confusing. In 53 Am Jur 601, Trial, § 815, the following rule is stated:

"A court giving instructions is bound to assume that they correctly state the law applicable to whatever state of facts there is evidence tending to prove, and it may not attempt to discredit the instructions given. To do so tends to mislead and confuse the jury."

See also *State v. Stone*, 111 Or 227, 233, 226 P 430.

If the court was convinced that there was no evidence in the record to justify the instruction, it should have withdrawn the instruction from the jury. The proceedings before the court respecting this instruction, and above quoted, indicate quite clearly that the jury was giving serious consideration to this matter.

▪ However, the record reveals that there were some circumstances and some evidence in the case which justified the giving of the instruction in question. The weight to be given that evidence was for the jury and not for the court to determine. The jury might have found (or a reasonable doubt might have been created) that defendant's participation in his wife's death, if he did participate, consisted only of running the water into the bathtub and helping her to get into it, which conduct on his part would have come within the meaning of the statute. Contrary to the claims of defend-

ant's counsel, the statute does not contemplate active participation by one in the overt act directly causing death. It contemplates some participation in the events leading up to the commission of the final overt act, such as furnishing the means for bringing about death, —the gun, the knife, the poison, or providing the water, for the use of the person who himself commits the act of self-murder. But where a person actually performs, or actively assists in performing, the overt act resulting in death, such as shooting or stabbing the victim, administering the poison, or holding one under water until death takes place by drowning, his act constitutes murder, and it is wholly immaterial whether this act is committeed pursuant to an agreement with the victim, such as a mutual suicide pact.

We now take note of other errors occurring upon the trial, some of them highly prejudicial.

■ During the trial the special prosecutor for the State (a former district attorney of Douglas county) was permitted, without objection to ask highly leading and prejudicial questions, as examples of which we direct attention to the following:

Upon the direct examination of Shirly Corrine Brennan, the first witness called by the State, counsel for the State asked this question:

"Now, on October 8th, 1952, and I will bring that to your attention—*the day that Mrs. Bouse was killed*—did you go to the Bouse home?

"A Yes." (Italics ours.)

Dr. Gerhardt Haugen, a specialist in the field of psychiatry, examined the defendant on behalf of the State. He described the defendant as "a mildly inadequate person". As a witness for the State, Dr. Haugen testified to the conversation he had had with defendant

as a part of the examination. Then counsel for the State addressed this question to him:

"Q Now, in your discussion with the defendant, did you go into the background of *his participation in the crime of murdering his wife?*
"A Yes." (Italics ours.)

Upon redirect examination of Dr. Haugen, the following testimony was given:

"Q In this particular instance, Doctor, do you have any question about your diagnosis?
"A No, sir.
"Q In your own mind?
"A No, sir.
"Q Now, this mildly depressed condition and this mildly—what did you say—a person who is mildly inadequate? You have examined many people, I think you said for the State Board of Parole and Pardon.
"A I have examined a number of *murderers* for them.
"Q It is a common finding, in a person who is charged with that type of crime being a mildly inadequate person, you mean?
"A Yes, I would say that much over half of them are." (Italics ours.)

Upon the direct examination of Virginia Bouse, the following question was asked:

"Q *At the time your mother was killed,* did your mother and you have any plans for any future activities together?
"A Well, yes, we did." (Italics ours.)

Upon cross-examination of Doga Whitley, a witness for defendant, counsel for the State asked this question:

"Q Now, *this murder was committed* on the 8th day of October, 1952.
"A I know." (Italics ours.)

On the direct examination of Dr. Alstrup N. Johnson, called by the State as a witness in rebuttal, the following occurred:

"Q Did you have any conversation with Ethel Bouse shortly before her death?

"A On the Monday previous to her death.

"Q *If she were killed on Wednesday,* it was the Monday before that?

"A That is right." (Italics ours.)

The vice in these questions was the assumption that Ethel Bouse had been killed, as distinguished from having committed suicide, and the further assumption that defendant had murdered her. The first improper question might have been asked through inadvertence, but the frequent repetition of the same error seemed to follow a set pattern for the prosecution of the defendant. When defendant's counsel failed to protect their client against such improper and prejudicial questioning, the court itself, in the interests of justice, should have taken action to stop it. As stated, the foregoing questions and answers are but samples of what the record reveals. The whole record reeks with improper, leading, and prejudicial questions asked by counsel for the State; questions as to which timely objections would necessarily have been sustained, and the answers to which would have been stricken from the record and the jury instructed to disregard them.

■ On his direct examination as a witness for the state, Dr. Homer Harris was asked to identify a bottle containing blood. The bottle was identified as containing blood removed from the body of decedent. The bottle and its contents were offered in evidence. Thereupon, the following occurred:

"MR. SLOCUM: I would like to inquire as to what purpose the State has for offering this in evi-

dence. I feel that the sole reason for introducing this in evidence would be to bias or prejudice the jury in this matter.

"MR. DAVIS: It is for the purpose of establishing the blood analysis made by Dr. Harris in his laboratory in Portland concerning *the lack of intoxication by the deceased.*" (Italics ours.)

Without objection by defendant's counsel, the exhibit was received in evidence. The intoxication or lack of intoxication of decedent was not an issue in the case, nor did it even remotely relate to any issue. No one had charged or claimed that she was intoxicated at the time of her death. The offered evidence served no purpose whatever and manifestly was incompetent, irrelevant, and immaterial, and if proper objection had been made, should have been rejected.

In September, 1951, Ethel Bouse filed in the circuit court for Douglas county, a complaint for divorce in which she charged her husband with cruel and inhuman treatment, specifying the acts constituting such alleged mistreatment. The suit was never brought to issue, and shortly after the filing of the complaint, the parties resumed their marital relations, which continued up to the very moment of the death of Mrs. Bouse. Upon the trial of this case the complaint in the divorce suit was offered and received in evidence without objection. Its admission was also improper.

It was, of course, proper for the State to establish by evidence that defendant and his wife had over a period of years and to the time of her death experienced serious marital difficulties, with more or less constant and serious arguments and quarrels between them, some of which at times resulted in blows being struck by one against the other. This evidence of domestic

trouble might be considered by a jury upon the question of motive. However, evidence as to the details or causes of or for such arguments is not admissible. Such evidence would open the door to a trial of collateral matters. Defendant was on trial for alleged murder; he was not on trial for the several acts of cruel and inhuman treatment charged in the divorce complaint.

Had this complaint been filed and served upon defendant immediately prior to October 8, 1952, the facts of its filing and service would have been material, but not the allegations thereof.

 Upon the direct examination of Dr. Harris, there was also identified and admitted into evidence an envelope containing fingernail clippings from the fingernails of decedent. As to these, Dr. Harris testified:

> "A I examined them first to see if there was any remarkable foreign material such as hair and bits of human skin of more than one type, and to see if there were any blood stains present. I found that there were blood stains present on the inner surface of one of the fingernail clippings."

That is all the witness found. There was no evidence in the record that the bloodstain found under one nail clipping was that of defendant, or of anyone else other than decedent. Defendant had no marks on his body indicating that he had been scratched with a fingernail, at least there is no such testimony in the record. In the absence of some evidence to connect the bloodstain with the defendant, the fingernail clippings were inadmissible in evidence; and even had there been such evidence, only the one fingernail clipping showing the bloodstain would have been admissible. Here again the inexperience of defense counsel permitted

incompetent evidence to be introduced against the defendant.

■ We shall now discuss what might well have been the most serious, damaging, and prejudicial error occurring during the trial. Virginia Bouse, defendant's daughter, was called as a witness by the State. She was permitted to testify as to the close relationship existing between herself and her mother, to plans they had made for the future, and to statements the mother had made to her. Thereupon, she gave the following testimony:

"Q Now, did your father and mother argue a lot?

"A Yes.

"Q What did they argue over?

"A Well, his lack of work and his drinking and his gambling *and then his molesting me.*

"Q Now, let's take those things up in order. Tell us about your father's working habits.

"A Well, he had always been pleasant and everybody liked him; they didn't know how he was at home; and he always seemed to have a pleasant personality and people liked him, so, therefore, I don't think jobs were too hard to find for him, but, oh, for some reason or other, he would always lose one or something and then when he came back from Alaska, he told mother he was sick and wasn't able to work.

"Q When he worked, did he bring his money home?

"A Half of the time; the other half, no.

"Q Did your parents ever have any arguments over his gambling?

"A Yes, quite a lot.

"Q Did they argue over his failure to support the family?

"A Yes.

"Q Now, when did this argument or the arguments take place over the fact that your father was molesting you?

"A Well, those took place when she applied for her divorce the first time.

"Q *When did that start, the fact that he molested you?*

"A *As far as I can remember, way back when I was in the first grade.*

"Q When did you first tell your mother about it?

"A When she applied for the divorce.

"Q How many days before?

"A It must have been—oh, it couldn't have been more than one day before, one or two." (Italics ours.)

It is noted that all this testimony was admitted without objection. As before pointed out, the details or causes of the several arguments between defendant and his wife were immaterial, being remote and in no sense a part of the res gestae. According to Virginia, the last argument between them occurred about three weeks prior to the death of Mrs. Bouse. All Virginia knew about this quarrel was what her father told her. The alleged "molesting" played no part in that trouble. A charge that a man has *molested* a female child under the age of 16 years immediately conveys to the average mind the imputation of a criminal assault—an assault which, if consummated, would constitute statutory rape. For a father to be charged with such bestial and incestuous conduct toward his own infant daughter would necessarily deeply shock the sense of moral decency and arouse the passions and prejudices of any normal person. The statements made by defendant's daughter about this alleged molesting were extremely prejudicial and were wholly incompetent and inad-

missible. The court should have stricken that testimony on its own motion. The law in this state is well settled concerning the admission of evidence of other offenses in the trial of a criminal case, and also as to evidence of purely collateral matters. It need not be repeated. *State v. Pace,* supra; *State v. Willson,* 113 Or 450, 230 P 810, 233 P 259, 39 ALR 84; *State v. Bateham,* 94 Or 524, 186 P 5; *State v. McAllister,* 67 Or 480, 136 P 354; *State v. Hembree,* 54 Or 463, 103 P 1008.

 In its instructions, the trial court failed entirely to explain to the jury the authority given them under the constitution and statutes of this state to determine the punishment in the event they found the defendant guilty of murder in the first degree, nor did it in any manner point out to the jury that in considering whether a recommendation of life imprisonment should accompany a verdict of guilty of murder in the first degree, they had the right to consider all the facts and circumstances of the case, and that, in the final analysis, the decision rested in their hands. The only mention made by the trial court in its instructions as to a recommendation of life imprisonment was as follows:

"* * * If you find that the defendant at the time and place mentioned in the indictment unlawfully and feloniously purposely and with deliberate and premeditated malice killed one Ethel Bouse by drowning her in the bath tub, then your verdict will either be one of murder in the first degree or murder in the first degree with a recommendation of life imprisonment. * * *.

"In order to find a verdict of guilty of murder in the first degree, it is necessary that all twelve of you agree—that is murder in the first degree—either a straight verdict of murder in the first degree or murder in the first degree with a re-

commendation of life imprisonment requires all twelve.''

The failure of the trial court to instruct the jury fully as to their authority in the matter of a recommendation of life imprisonment constituted error. It is mandatory that such an instruction be given in every case involving a charge of first-degree murder.

We have discussed quite fully the substantial errors committed on the trial. We did this so that similar error may be avoided on a retrial. It is obvious that defendant did not receive that fair and impartial trial, according to the rules of law and evidence applicable, to which he was entitled under the constitution and laws of this state. Most of the errors commented upon are palpable errors, errors to which this court cannot close its eyes without violating its firm duty to see that the constitutional rights of an accused person are ever protected and preserved.

The judgment is reversed, and this cause is remanded for a new trial.

LUSK and BRAND, JJ., concur in the result.