869 P.2d 301

**STATE of New Mexico,
Plaintiff–Appellee,**

v.

**Billy Leroy SEXSON Jr.,
Defendant–Appellant.**

**No. 14470.**

Court of Appeals of New Mexico.

Jan. 5, 1994.

Certiorari Denied Feb. 18, 1994.

Tom Udall, Atty. Gen., Joel Jacobsen, Asst. Atty. Gen., Santa Fe, for plaintiff-appellee.

Sammy J. Quintana, Chief Public Defender, Susan Gibbs, Asst. Appellate Defender, Santa Fe, for defendant-appellant.

## OPINION

CHAVEZ, Judge.

Billy LeRoy Sexson, Jr., appeals his conviction for second degree murder in the death of his wife, Debra Marie Sexson. The principal issue raised on appeal is whether Defendant should have been prosecuted for assisting suicide rather than for murder. We affirm Defendant's conviction for second degree murder for the reasons set out below.

### FACTS

Most of the facts below are taken from the trial court's findings of fact. The only fact in dispute was whether Defendant or his wife actually pulled the trigger of the .22 caliber rifle at the time it was used to kill the wife.

In 1978, Defendant was convicted of killing his first wife, Debbie, and was sentenced to the Oklahoma penitentiary system. While incarcerated at a minimum security prison he married his second wife, Debra Marie Thomas Sexson. Shortly thereafter, Defendant escaped from prison.

Defendant and his second wife, hereinafter referred to as Victim, then left Oklahoma where Defendant had been incarcerated. During their travel through Pampa, Texas, Victim voluntarily purchased a rifle which ultimately became the instrument of her death. The couple arrived in Tucumcari, New Mexico and arranged to rent an apartment. While in Tucumcari, Defendant and Victim had contact with several people and Victim was absent from the presence of Defendant on several occasions. There is no proof that Defendant in any way coerced Victim to remain in his company.

Concern over Defendant's return to the Oklahoma penitentiary system and mounting financial pressures caused Defendant and Victim to discuss the possibility of a mutual suicide on several occasions. Ultimately, Victim and Defendant entered into a mutual suicide pact as exhibited by the suicide note written by Victim and endorsed by Defendant and by the notes on the wall of their apartment. The suicide pact was genuine, voluntarily entered into between the parties, and was not the result of coercion or fraud by Defendant. In the suicide note and on other occasions, Victim and Defendant expressed their continuing love for each other and their belief that the mutual suicide would allow them to be together forever after death.

After discussing the means of suicide, Victim aided Defendant in shortening the barrel and stock on the rifle in order to use it for suicide purposes. On November 29, 1991, Defendant drank some alcoholic beverages, but was not intoxicated to the extent that he was unable to form a deliberate intent to take away the life of another. On the same day, in furtherance of the mutual suicide

pact, Defendant, according to the findings of the trial court, held the rifle to Victim's left temple and killed Victim by pulling the trigger. Defendant claims that he merely held the rifle in position, while Victim pulled the trigger so as to cause her own death. Defendant also testified that Victim continued to breathe after being shot. Victim's ability to breathe after being shot, "freaked out" Defendant and as a result, he was unable to kill himself. Later that day, Defendant turned himself in to the Tucumcari police advising them that he had killed Victim.

The trial court found Defendant did not suffer from a mental disease that substantially affected his mental processes and substantially impaired his behavior controls. The court also determined that he knew what he was doing, understood the consequences of his act, understood that his act was wrong, and could have prevented himself from killing Victim.

Defendant was charged with first degree murder in violation of NMSA 1978, Section 30–2–1(A) (Repl.Pamp.1984). Following a bench trial, the trial court found Defendant guilty of second degree murder in violation of Section 30–2–1(B). Defendant appeals from this conviction.

## DISCUSSION

Defendant offers two theories to support his contention that he should have been prosecuted for assisting suicide instead of murder. The first theory is that the evidence is not sufficient to support a conviction of second degree murder. The second theory is that the finding of the existence of a genuine suicide pact exempts him from a murder conviction.

## I. Sufficiency of Evidence Establishing Defendant's Guilt of Second Degree Murder.

Defendant contends that the evidence was insufficient to support his conviction of second degree murder under Section 30–2–1(B). He argues that he should have been prosecuted for assisting suicide under NMSA 1978, Section 30–2–4 (Repl.Pamp.1984), which states: "Assisting suicide consists of deliberately aiding another in the taking of

his own life. Whoever commits assisting suicide is guilty of a fourth degree felony."

## A. Standard of Review.

In reviewing for sufficiency of evidence, it is established that the "court must view the evidence in the light most favorable to the state, resolving all conflicts therein and indulging all permissible inferences therefrom in favor of the verdict." *State v. Sutphin*, 107 N.M. 126, 131, 753 P.2d 1314, 1319 (1988). The Court must not weigh the evidence or substitute its judgment for that of the fact finder so long as there is sufficient evidence to support the verdict. *Id.; see State v. Hernandez*, 115 N.M. 6, 26, 846 P.2d 312, 332 (1993).

Defendant contends that the above standard no longer applies in light of *State v. Garcia*, 114 N.M. 269, 837 P.2d 862 (1992). We do not agree. *Garcia* states, "we perceive it to be an appellate court's duty on review of a criminal conviction to determine whether *any* rational jury could have found each element of the crime to be established beyond a reasonable doubt." *Id.* at 274, 837 P.2d at 867. Defendant extends *Garcia* to stand for the inverse proposition that the evidence relied upon must be such as to allow the court to exclude all reasonable doubts of innocence before finding a defendant guilty. However, that interpretation is contradicted by additional language in *Garcia* which states that "[a]n appellate court does not evaluate the evidence to determine whether some hypothesis could be designed which is consistent with a finding of innocence." *Id.* (quoting *Sutphin*, 107 N.M. at 130–31, 753 P.2d at 1318–19).

Further, Defendant's interpretation of *Garcia* has been specifically refuted by this Court in *State v. Orgain*, 115 N.M. 123, 847 P.2d 1377 (Ct.App.), *cert. denied*, 115 N.M. 145, 848 P.2d 531 (1993). In *Orgain*, this Court stated:

> [W]e believe that *Garcia* merely reiterated the established law that the standard must be viewed in the context of the state's burden below—to prove each element of the crime beyond a reasonable doubt. Thus, *Garcia* reminds us that our review involves a two-step process: deference to

the resolution of factual conflicts and inferences derived therefrom, and a legal determination of whether the evidence viewed in this manner could support the conviction. *Id.* at 126, 847 P.2d at 1380 (citations omitted). Therefore, the standard as stated in *Sutphin* and reaffirmed in *Hernandez* is still the appropriate standard to apply.

### B. The Doctrine That a Specific Statute Controls Over a General Statute on the Same Topic Does Not Apply Under the Facts of This Case.

 Defendant argues because assisting suicide is prohibited in a specific New Mexico statute, this case should have been prosecuted under the assisting suicide statute and not under the general statute prohibiting murder. However, for a specific statute to prevail over a more general statute, both must condemn the same offense and require the same proof. *State v. Whitaker,* 110 N.M. 486, 488, 797 P.2d 275, 277 (Ct.App.), *cert. denied,* 109 N.M. 631, 788 P.2d 931 (1990).

In this instance the two statutes at issue condemn different offenses. The wrongful act triggering criminal liability for the offense of assisting suicide is "aiding another" in the taking of his or her life. See § 30-2-4. It is well accepted that "aiding," in the context of determining whether one is criminally liable for their involvement in the suicide of another, is intended to mean providing the means to commit suicide, not actively performing the act which results in death. *See* 2 Wayne R. LaFave & Austin W. Scott, Jr., *Substantive Criminal Law,* § 7.8(c) (1986); *see also In re Joseph G.,* 34 Cal.3d 429, 194 Cal.Rptr. 163, 167, 667 P.2d 1176, 1180 (1983) (en bank) ("If the defendant merely furnishes the means, he is guilty of aiding a suicide; if he actively participates in the death of the suicide victim, he is guilty of murder."); *State v. Cobb,* 229 Kan. 522, 625 P.2d 1133, 1136 (1981) (actively performing the overt act resulting in death is murder); *State v. Bouse,* 199 Or. 676, 264 P.2d 800, 812 (1953) (en banc) (assisting suicide statute is aimed at criminalizing participation in events leading to a suicide, such as providing the means for accomplishing the act, but actively performing the overt act resulting in death is murder), *overruled on other grounds by*

*State v. Fischer,* 232 Or. 558, 376 P.2d 418, 421 (1962). *See generally* John H. Derrick, Annotation, *Criminal Liability for Death of Another as Result of Accused's Attempt to Kill Self or Assist Another's Suicide,* 40 A.L.R.4th 702 (1985).

There are three different views about the criminal liability of one who, whether pursuant to a suicide pact or not, solicits (by talk) or *aids (as by providing the means of self-destruction)* another to commit suicide. Occasionally aiding or soliciting suicide has been held to be no crime at all on the ground that suicide is not criminal. That view is most certainly unsound. At one time many jurisdictions held it to be murder, but a great many states now deal specifically with causing or aiding suicide by statute, treating it either as a form of manslaughter or as a separate crime. *Such statutes typically do "not contemplate active participation by one in the overt act directly causing death," and thus their existence is not barrier to a murder conviction in such circumstances.*

2 LaFave & Scott, *supra,* § 7.8(c), at 249–50 (citations omitted) (emphasis added).

In contrast, the wrongful act triggering criminal liability for second degree murder is "kill[ing]" or "caus[ing] the death" of another. In the context of the instant case, the second degree murder statute is aimed at preventing an individual from actively causing the death of someone contemplating suicide, whereas the assisting suicide statute is aimed at preventing an individual from providing someone contemplating suicide with the means to commit suicide. Thus, the two statutes do not condemn the same offense. The rule of statutory construction that the specific law controls over the general is not applicable in this instance. *See Whitaker,* 110 N.M. at 488, 797 P.2d at 277.

### C. Evidence Presented Supports a Conviction of Second Degree Murder Rather than a Conviction of Assisting Suicide.

 As previously noted, other jurisdictions have held that the difference between murder and aiding suicide generally hinges

upon whether the defendant *actively* participates in the overt act directly causing death, or whether he merely provides the means of committing suicide. *See People v. Matlock*, 51 Cal.2d 682, 692–94, 336 P.2d 505, 510–11 (1959) (en banc); *Bouse*, 264 P.2d at 812; *Cobb*, 625 P.2d at 1136. This rule applies even where the victim has given his consent or requested the actual assistance provided. *See Matlock*, 51 Cal.2d at 692–94, 336 P.2d at 510–11; *Cobb*, 625 P.2d at 1136; *Bouse*, 264 P.2d at 812.

Such was the case in California where a defendant was found to have actively assisted in the victim's strangulation by holding the victim to keep him from falling off the bed in order to assure that the victim achieve his desired outcome of death. *People v. Cleaves*, 229 Cal.App.3d 367, 375, 280 Cal.Rptr. 146, 151 (Ct.App.), *review denied* (July 17, 1991). That court stated that the act of holding the victim on the bed was indisputably active assistance in the overt act of strangulation so the defendant was not entitled to jury instructions regarding aiding and abetting suicide. *Id.*

In this case, Defendant admitted holding the rifle in a position calculated to assure Victim's death. That action transcends merely providing Victim a means to kill herself and becomes active participation in the death of another. *See Matlock*, 51 Cal.2d at 694, 336 P.2d at 511; *Cleaves*, 229 Cal.App.3d at 375, 280 Cal.Rptr. at 151. There was other evidence presented to the trial court in addition to Defendant's above admission. There was Defendant's taped, voluntary statements to the police which included, " 'I shot her' " and " 'I killed her.' " The forensic pathologist who supervised the autopsy testified that the rifle was probably fired from a distance of between one-quarter of an inch and two inches from Victim's head. He further stated that most gunshot suicides involve contact wounds. Also, Victim was shot in the left side of the head, although she was right handed. Evidence admitted shows little or no blood on Victim's hands and forearms even though there were blood splatters caused by "blow back" on the bed and curtain.. Thus the trial court had before it enough evidence to support a conviction of second degree murder because there was sufficient evidence to show that Defendant actively participated in the suicide by holding the gun to Victim's head and pulling the trigger.

## II. Suicide Pact.

█ The existence of a suicide pact is generally not an exception to the rule distinguishing between assisting suicide and committing murder. *Bouse*, 264 P.2d at 812; *see also Turner v. State*, 119 Tenn. 663, 108 S.W. 1139, 1141 (1908) (defendant, who shot his mistress pursuant to a suicide pact with her and then lost the resolve to shoot himself, found guilty of murder). However, that general rule may not apply where the means of attempted suicide used presents the same risk to both of the parties at the same time. *In re Joseph G.*, 34 Cal.3d at 436–39, 194 Cal.Rptr. at 168–70, 667 P.2d at 1181–83.

In *In re Joseph G.* a couple drove off a cliff together pursuant to a suicide pact and one party survived that crash. The California Supreme Court reversed the murder conviction of the surviving party, noting that the instrumentality used subjected both parties to a simultaneous risk of death. That eliminated the potential for fraud by one person feigning or reneging on the agreement. *Id.*

This case is distinguishable from *In re Joseph G.* because here the suicide and the attempted suicide were not committed simultaneously by the same act and the risk of death was not identical to both participants. Here, by using a sawed-off rifle as the instrumentality of death, Victim faced a high risk which resulted in her death, while Defendant was able to choose not to subject himself to any risk. Thus, the policy considerations supporting a suicide pact exception as recognized by the court in *In re Joseph G.* do not exist in this case.

Based on the above, we affirm Defendant's conviction for second degree murder.

**IT IS SO ORDERED.**

DONNELLY and BIVINS, JJ., concur.