# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### October 25, 2011 Session

## STATE OF TENNESSEE v. WENDI  NICOLE GARRISON

**Direct Appeal from the Criminal Court for Carter County**
**No. S17724     Lynn W. Brown, Judge**

**No. E2011-00496-CCA-R3-CD - Filed July 27, 2012**

A Carter County Criminal Court Jury convicted the appellant, Wendi Nicole Garrison,[1] of the second degree murder of the victim, Joshua Perry.  The trial court imposed a sentence of sixteen years in the Tennessee Department of Correction.  On appeal, the appellant argues that the evidence is insufficient to sustain her conviction, that the trial court erred in denying her request to charge assisted suicide as a lesser-included offense of second degree murder, and that the trial court erred in denying her request for a jury instruction regarding assisted suicide as a defense to second degree murder.  Upon review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., J., joined.  JERRY L. SMITH, J., not participating.

Stacy L. Street, Elizabethton, Tennessee, and James T. Bowman, Johnson City, Tennessee, for the appellant, Wendi Nichole Garrison.

Robert E. Cooper, Jr., Attorney General and Reporter; Lacy Wilber, Assistant Attorney General; and Al Schmutzer, Jr., District Attorney General, Pro Tempore, for the appellee, the State of Tennessee.

## OPINION

### I.  Factual Background

The appellant was convicted of the second degree murder of the victim, but on direct

---

[1] The appellant's name is also spelled "Wendi Nichole Garrison" in the record.

appeal this court reversed the conviction based upon the trial court's error to charge the jury on the lesser-included offense of voluntary manslaughter. See State v. Wendi Nicole Garrison, No. E2007-02895-CCA-R3-CD, 2009 WL 2501994, at *1 (Tenn. Crim. App. at Knoxville, Aug. 14, 2009). This appeal resulted from the retrial on the charge of second degree murder.

Nora Davis testified at trial that in 2005, the appellant and the victim lived together in a residence she rented to them next door to her own home. In the early morning hours of March 25, 2005, the appellant rang Davis' doorbell. Davis answered the door, and the appellant, who was "crying and carrying on," told Davis that she had shot the victim. Davis called 911 to ask for help.

A tape recording of the 911 telephone call was played for the jury. During the call, the appellant informed the 911 operator that the victim told her that she could not leave unless she killed him. The appellant said that the victim put a "muzzleloader" up to his head and that "he said here just pull the trigger and I said you're such a f[***]ing asshole and I just pulled the trigger." She said that the gun had not had a "cap" in it since deer season. She told the operator that she believed the victim was dead because he was lying in the floor, he was unresponsive, and there was "brain matter" everywhere. The appellant repeatedly said that the victim told her to pull the trigger, she did, and the victim was dead.

Carter County Sheriff's Deputy Patrick Shawn Johnson, was one of the first officers who responded to the scene. He went into Davis' residence and saw the appellant sitting at the kitchen table. She was crying, distraught, and wiping her tears with her hands. The appellant said that she and the victim had argued all night, that she had wanted to leave, and that the victim would not let her. The victim retrieved the appellant's .50 caliber muzzleloader rifle and told her that she would have to shoot him before she could leave. The victim said that "[s]he pulled the trigger and now he's dead." The appellant said that she had the muzzleloader rifle for hunting and that there had not been a "cap" on the gun for a long time. Deputy Johnson saw blood, tissue, and brain matter on the appellant's left side from her hair to her pants leg.

Tennessee Bureau of Investigation (TBI) Agent Shannon Morton and Carter County Sheriff's Deputy Todd Hamm went to the appellant's residence to examine the crime scene. They found the body of the victim on the living room floor in front of a loveseat. Blood, tissue, bits of skull, and pieces of brain matter were scattered around the room. Agent Morton found the weapon that had been used to kill the victim, a .50 caliber muzzleloader rifle. A "fanny pack" containing supplies for the muzzleloader rifle was "looped" in the victim's fingers. Pieces of a cellular telephone that had been burned were found in the fireplace.

Agent Morton did not see any injuries to the appellant. However, after the appellant was arrested, she complained of an injury to her thumb and was taken to the hospital. Dr. Randall Lee Belt, who treated the appellant at Sycamore Shoals Hospital, said that the appellant had a bruise and a sprain to her right thumb and a small bruise on her forearm. Dr. Belt said that the appellant had no further injuries.

Over an hour after the shooting, Agent Morton had a gunshot residue test performed on the appellant's hands to see if she had fired a weapon. The appellant suggested that Agent Morton also have the test performed on the victim. She stated that "she thought that he had helped pull the trigger." TBI Agent James Russell Davis, II, examined the results of the test that was performed on the victim and determined that the victim had "fired, handled, or was near a gun when it was fired." Agent Davis said that the test on the appellant was inconclusive but could not eliminate the possibility that she fired a gun. Agent Davis explained that the length of time between the shooting and the test, as well as the appellant's wiping tears with her hands, could have affected the results of the test.

TBI Agent Alex Brodhag testified that to arm the muzzleloader rifle, gunpowder or pellets made of compressed gunpowder are poured down the barrel, then a bullet is seated on top of the gunpowder and is held in place by a "209 shot shell primer" or "cap." When the safety is turned off, the weapon is ready to fire. Agent Brodhag was unable to conclusively state that the bullet fragments found at the scene had been fired from that weapon; however, he stated that the type and size of the rifling marks on the fragments were consistent with the muzzleloader rifle.

TBI Agent Charles Hardy stated that he examined the muzzleloader rifle and that he found nothing of significance on the right side of the weapon. However, on the left side of the rifle, he found human blood along the barrel, on the stock, and on the scope. Agent Hardy also examined the clothes the appellant was wearing at the time of the shooting. He noticed the highest concentration of "high velocity impact staining on the left arm" of her shirt and some additional staining to the shoulders of her shirt. The highest concentration of staining on her pants was located on the outside seam of the left leg. Agent Hardy explained that "the amount of high velocity impact spatter on the left sleeve is more consistent with that area of the body being closer to the source of the blood after the shot was fired." He further explained that the appellant had "to be within three to five feet [of the victim] to have the type of staining on her shirt and the weapon to be present."

During the autopsy, Dr. William McCormick discerned that the victim's death was the result of "a massive lethal brain wound" that was caused by a single gunshot wound to the head. He said that the "whole back of the head was gone" and that a large portion of the victim's brain and skull had been "thrown out of the back of the head." Dr. McCormick

-3-

noted that in addition to the "massive damage to the [victim's] face, head, [and] the eye socket," the victim also had some scratch marks on the right side of his neck, a bruise on his right hand, and a bruise on his left shoulder.

The appellant testified that she was a hairdresser and that she graduated high school in 1990. She said that in 1998, she joined the army and went through six weeks of basic training, during which she received weapons training. She was trained on an "M-16 A2" but not on a muzzleloader rifle. She said she was also trained in "body to body" combat with people larger than she was. She was honorably discharged after she fractured her pelvic bone. In 2001, the appellant joined the army reserves where she again trained in the use of a "M-16 A2."

She said that she met the victim in June 2004 at a neighbor's house. The victim, who was five years younger than the appellant, told her that he was married but was getting a divorce. Although the appellant was initially reluctant, the two began having a relationship.

The appellant said that the victim moved in with her in July or August 2004. The appellant said that one weekend in August 2004, the victim repeatedly assaulted her by choking her and banging her head into the floor. Police arrived and took the victim into custody. The following Monday, the victim got out of jail, and the appellant took out an order of protection against the victim. However, within hours of obtaining the order, she contacted the victim. The victim promised he would not hurt her again, so she had the order of protection dismissed and refused to prosecute the victim for the assault.

Shortly after the court proceedings, the victim and the appellant decided to have a baby. The appellant acknowledged that the victim was still married and had filed for bankruptcy. Around Christmas 2004, they learned that the appellant was pregnant. In January, they began moving into the house beside Davis, but the appellant also kept her apartment.

The appellant said that before the move was completed, she and the victim had a disagreement during which the appellant threatened to call 911. The victim left, but he punched or kicked the door after the appellant locked it. Afterward, the victim called the appellant and threatened to kill her, the baby, and any man who came into the appellant's life. The appellant told him to quit calling, and later she and her mother moved her things out of the house.

The appellant said that she moved back into her apartment and that the victim lived at the house. After the appellant miscarried, she and the victim resumed their relationship and began living together in the house. They "argued a little bit" about the victim seeing

someone else while they were "broken up."

The appellant said that in October or November 2004, she and the victim bought the muzzleloader rifle so she could hunt with him. She maintained that she could not load the rifle and that the victim always loaded the rifle. She said that she watched the victim load it and and that loading it "looked complicated." She acknowledged that she had shot the muzzleloader rifle once.

On March 24, 2005, the victim went to a bankruptcy hearing, and the appellant ran errands. The appellant said that things were "good" between them. Earlier in the day, she bought candy and gum for an Easter basket she was making for the victim. She expected the victim home around 11:45 p.m., so she built a fire and dressed nicely. Around midnight, the appellant came home with beer. They drank beer, watched a music video, and danced before going to Walmart to buy movies. Afterward, they watched a movie and got into a "silly fight over the parenting topic in the movie."

After the fight, the victim played a CD that he had purchased at Walmart. The victim asked the appellant if she wanted to try to have another baby. The appellant replied that she did not want to talk about it. The victim hit his face against her face, called her a "f-ing bitch," and blamed her for the miscarriage. The appellant hit the victim, ran to the bedroom, crawled to the edge of the bed, and cried. The victim came into the room, sat on the bed, and asked if they were going to have sex. She told him no and ran toward the kitchen. The victim grabbed her hair, and she fell to the floor. He straddled her and beat her head against the floor. The appellant said that she "smacked" the victim and attempted to push him away. According to the appellant, the victim grabbed her wrists, put her hands against his throat, "and he started with all his weight, and he threw his arms out and he was yelling kill me, f-ing kill me, kill me."

The appellant said that she begged the victim to allow her to leave, reminding him that he had promised to never hurt her again. She tried unsuccessfully to get her car keys from the victim, and he threw her cellular telephone into the fireplace. The appellant sat on the hearth of the fireplace, and the victim sat down on the coffee table. The appellant said that "it was calm. No more yelling. No more hitting."

The victim told the appellant that she was never going to leave him and that they would never leave the house. The victim picked up the muzzleloader rifle, which had been propped in the corner of the room, and went through the bedrooms, yelling, "Where is my f-ing fanny pack."

The appellant said that as she stood to leave, the victim returned with the gun. The

victim backed the appellant to the loveseat, and she "sat in an Indian-style position . . . [w]ith both my legs up on the cushion crossed." The victim stood in front of her. The appellant felt the butt of the gun press against her thigh. She said:

> [H]e had [the gun] to his forehead. And he began yelling, pull the f-ing trigger. Kill me. Pull the f-ing trigger. And when he starts yelling that he starts saying, here, here, and he's reaching for my arm. And I'm bracing it against myself and I'm leaning down as far as . . . I can and [h]e's pulling my arm, and he gets it. And I keep my fist closed. He's just trying to open my hand, and he peeled my finger. He peeled my finger out and he put it on the trigger . . . .

The appellant told the victim, "Let's just go to bed, it's always okay in the morning." The victim again told the appellant to kill him. The appellant thought the gun was loaded, but she was not sure. She looked out the window instead of looking at the victim, hoping to avoid angering him further by making eye contact. She said that she did not intend to pull the trigger but that she felt "like [her] finger was on the trigger when it went off." She stated, "I don't know if he pulled the trigger or if it was an accident."

The appellant said that when the victim fell to the floor, she thought he was just trying to scare her. She yelled for the victim to get up, but he did not. She heard liquid falling and realized the victim was bleeding. As she ran out the door, she saw "brain matter" and a piece of skull near the door. She feared the victim was dead. She ran to Davis' house, and Davis called 911.

The appellant acknowledged that she told the 911 operator that she called the victim a "f[***]ing asshole" and pulled the trigger, but she asserted that "there's more to it." She said, "I felt like I'd pulled the trigger."

Dr. Larry S. Miller, an expert in accident reconstruction, testified that the physical proof indicated the gun was "pointed slightly toward . . . the victim. The victim's head [was] over the top of the muzzle rifle and his left hand [was] down near the port or the trigger."

Paulette Sutton, a blood spatter expert, testified that the spatter on the appellant's face indicated that she was facing the shot when it was fired. Additionally, Sutton said that the spatter was consistent with the appellant's claim that she was sitting on the loveseat and that the victim was standing in front of her.

The jury found the appellant guilty of second degree murder. On appeal, the appellant

argues that the evidence is insufficient to sustain her conviction, that the trial court erred in denying her request to charge assisted suicide as a lesser-included offense of second degree murder, and that the trial court erred in denying her request for a jury instruction regarding assisted suicide as a defense to second degree murder.

## II. Analysis

### A. Sufficiency of the Evidence

On appeal, a jury conviction removes the presumption of the appellant's innocence and replaces it with one of guilt, so that the appellant carries the burden of demonstrating to this court why the evidence will not support the jury's findings. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The appellant must establish that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e).

Accordingly, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. See State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). In other words, questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, and not the appellate courts. See State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990).

To sustain the appellant's conviction for second degree murder, the State was required to prove that the appellant knowingly killed the victim. See Tenn. Code Ann. § 39-13-210(a)(1). Our supreme court has determined that second degree murder is a result of conduct offense. See State v. Ducker, 27 S.W.3d 889, 896 (Tenn. 2000). Accordingly, "[a] person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." Tenn. Code Ann. § 39-11-302(b). Moreover, "[o]ur jurisprudence recognizes that the mental state, a necessary factor of almost all our criminal statutes, is most often proven by circumstantial evidence, from which the trier of fact makes inferences from the attendant circumstances and from which that body weighs the circumstantial evidence." State v. Jeffrey Antwon Burns, No. M1999-01830-CCA-R3-CD, 2000 WL 1520261, at *3 (Tenn. Crim. App. at Nashville, Oct. 13, 2000).

The proof at trial revealed that the appellant and the victim had a tumultuous relationship that was marked by violence. On the night in question, the appellant and the victim began fighting about the appellant's miscarriage. The appellant said that the victim put the muzzle of the gun to his forehead and told her to pull the trigger. On the 911 tape,

the appellant said that she called the victim an "asshole," then she pulled the trigger. Initially, the appellant maintained that she did not know if the gun was loaded; however, she later acknowledged that she "figured that it was loaded." Although the appellant told the jury that she did not intend to pull the trigger, the jury obviously discredited this testimony. We conclude that the proof amply supports the appellant's conviction for second degree murder.

## B. Jury Instructions

The appellant's two final issues concern the trial court's refusal to grant her request for two jury instructions. A defendant has a "constitutional right to a correct and complete charge of the law." State v. Teel, 793 S.W.2d 236, 249 (Tenn. 1990). Accordingly, trial courts "should give a requested instruction if it is supported by the evidence, embodies a party's theory, and is a correct statement of the law." State v. Phipps, 883 S.W.2d 138, 150 n. 20 (Tenn. Crim. App. 1994). Moreover, we have previously noted that "[w]e must review the entire [jury] charge and only invalidate it if, when read as a whole, it fails to fairly submit the legal issues or misleads the jury as to the applicable law." State v. Forbes, 918 S.W.2d 431, 447 (Tenn. Crim. App. 1995). A charge resulting in prejudicial error is one that fails to fairly submit the legal issues to the jury or misleads the jury about the applicable law. State v. Hodges, 944 S.W.2d 346, 352 (Tenn. 1997). However, trial courts need not give requested instructions if the substance of the instructions is covered in the general charge. State v. Zirkle, 910 S.W.2d 874, 892 (Tenn. Crim. App. 1995). Generally, when a jury charge is complete without the inclusion of the special instruction, a trial court does not err in refusing to give the special instruction. See State v. Story, 608 S.W.2d 599, 603 (Tenn. Crim. App. 1980).

### 1. Instruction on Assisted Suicide as a Lesser-Included Offense

The appellant first contends that the trial court should have instructed the jury on assisted suicide as a lesser-included offense of second degree murder. We note that "[i]n applying the lesser-included offense doctrine, three questions arise: (1) whether an offense is a lesser-included offense; (2) whether the evidence supports a lesser-included offense instruction; and (3) whether an instructional error is harmless." State v. Allen, 69 S.W.3d 181, 187 (Tenn. 2002).

State v. Burns, 6 S.W.3d 453, 466-67 (Tenn. 1999), provides that an offense is a lesser-included offense if:

> (a) all of its statutory elements are included within the statutory elements of the offense charged; or

(b) it fails to meet the definition in part (a) only in the respect that it contains a statutory element or elements establishing

(1) a different mental state indicating a lesser kind of culpability; and/or

(2) a less serious harm or risk of harm to the same person, property or public interest; or

(c) it consists of

(1) facilitation of the offense charged or of an offense that otherwise meets the definition of lesser-included offense in part (a) or (b); or

(2) an attempt to commit the offense charged or an offense that otherwise meets the definition of lesser-included offense in part (a) or (b); or

(3) solicitation to commit the offense charged or an offense that otherwise meets the definition of lesser-included offense in part (a) or (b).

Additionally, our supreme court noted that "part (b) of our test is narrow[] in that the statutory elements remain the focus of the inquiry." Burns, 6 S.W.3d at 467.

In the instant case, the appellant was charged with second degree murder, which is "[a] knowing killing of another." Tenn. Code Ann. § 39-13-210(a)(1). The trial court also instructed the jury on the lesser-included offenses of voluntary manslaughter and reckless homicide. The appellant argues that assisted suicide should have been charged as a lesser-included offense. Tennessee Code Annotated section 39-13-216 provides:

(a) A person commits the offense of assisted suicide who:

(1) Intentionally provides another person with the means by which such person directly and intentionally brings about such person's own death; or

(2) Intentionally participates in a physical act by which another person directly and intentionally brings about such person's own

death; and

(3) Provides the means or participates in the physical act with:

(A) Actual knowledge that the other person intends to bring about such person's own death; and

(B) The clear intent that the other person bring about such person's own death.

. . . .

(g) Assisted suicide is a Class D felony.

The appellant acknowledges that "[a] thorough search of case law in this jurisdiction reveals that there is no authority which labels assisted suicide as a lesser included offense of second degree murder."[2] The appellant concedes that assisted suicide does not satisfy the requirements for a lesser-included offense under part (a) of the Burns test because all of its statutory elements are not included within the statutory elements of the charged offense of second degree murder. Further, assisted suicide is not a lesser-included offense under part (c) of the Burns test. However, the appellant contends that assisted suicide should be considered a lesser-included offense under part (b) of the Burns test because "it is apparent that the legislature considers assisted suicide [a Class D felony] to be a less blameworthy and less serious offense than second degree murder [a Class A felony]."

The appellant's argument is unavailing. Part (b)(1) of the Burns test requires "a different mental state indicating a lesser kind of culpability." For second degree murder, a person must "knowingly" commit the killing; for assisted suicide, a person must act "intentionally." An "intentional" mental state is not lesser than "knowing." See State v. Honeycutt, 54 S.W.3d 762, 771 (Tenn. 2001). Moreover, part (b)(2) is not satisfied because the harm or risk of harm to the victim is the same, not lesser.

---

[2]We note that other states have concluded that assisted suicide should not be charged when a defendant is prosecuted for murder. See People v. Cleaves, 280 Cal.Rptr. 146, 150 (Cal. Ct. App. 1991); People v. Gordon, 32 P.3d 575, 579 (Colo. Ct. App. 2001); State v. Cobb, 625 P.2d 1133, 1135-36 (Kan. 1981); State v. Sexson, 869 P.2d 301, 304 (N.M. Ct. App. 1994); People v. Minor, 898 N.Y.S.2d 440, 442 (N.Y. Sup. Ct. 2010); State v. Goulding, 799 N.W.2d 412, 415 (S.D. 2011); Goodin v. State, 726 S.W.2d 956, 958 (Tex. App. 1987); see also 2 Wayne R. LaFave, Substantive Criminal Law § 15.6(c), at 547 (2d ed. 2003) (stating that assisted suicide "statutes typically do 'not contemplate active participation by one in the overt act directly causing death,' . . . and thus their existence is no barrier to a murder conviction in such circumstances").

2. Instruction on Assisted Suicide as a Theory of Defense

Finally, the appellant contends that the trial court erred by denying the appellant's request to instruct the jury on the appellant's "theory of defense that the victim was attempting to commit suicide and that the [appellant's] actions constituted no more than assistance in such attempt." The trial court denied the request by noting that "the court's of the opinion that that would be a comment on the evidence, [but] nothing prohibits [the defense] from arguing that." On appeal, the appellant maintains that "by refusing to grant this instruction, [the trial court] deprived . . . the jury from considering the theory of the [appellant] that was supported by the evidence presented throughout this trial."

Initially, we note that assisted suicide is not a statutorily-listed defense. See Tenn. Code Ann. § 39-11-201 et seq., -501 et seq., -601 et seq. Regardless, the trial court allowed the appellant to argue to the jury that she did not commit second degree murder and that, if anything, she merely assisted the victim in committing suicide. Therefore, the trial court did not preclude the appellant from positing her theory of defense. We conclude that the trial court did not err in refusing the instruct the jury on assisted suicide as a theory of defense.

### III. Conclusion

In sum, we conclude that the proof was sufficient to sustain the appellant's conviction for second degree murder and that the trial court did not err in instructing the jury. Accordingly, we affirm the judgment of the trial court.

_____
NORMA McGEE OGLE, JUDGE

-11-