[Crim. No. 6227. In Bank. Mar. 10, 1959.]

THE PEOPLE, Respondent, v. EARL FERNANDO MATLOCK, Appellant.

Phil H. Curry, under appointment by the Supreme Court, for Appellant.

Edmund G. Brown, Attorney General, and Norman H. Sokolow, Deputy Attorney General, for Respondent.

SCHAUER, J.—A jury found defendant guilty of murder of the first degree and robbery of the second degree and fixed the penalty on the murder count at death. This is an appeal (pursuant to Pen. Code, § 1239, subd. (b)) from the ensuing judgment and from an order denying defendant's motion for new trial. The theory of the defense was that defendant did not murder his victim, Max Shayne, in the perpetration of robbery but, rather, acted solely at the request of Shayne who, because he desired to die but did not wish to give the appearance of suicide, induced defendant to strangle him and to take his property so that he would appear to have been the victim of murder and robbery. For reasons hereinafter set forth we have concluded that reversal is necessary because

the trial judge erroneously excluded evidence proffered by defendant which was relevant to this theory of the defense. In the course of our ensuing discussion we also consider (as directed by Code Civ. Proc., § 53) other asserted errors which may be pertinent upon a new trial.

Defendant's contention that the evidence is insufficient to support the verdicts is without merit. It is based upon the unwarranted assumption that the jury were required to believe certain testimony of defendant and could not draw reasonable inferences favorable to the People from the evidence as a whole.

For the purposes of this opinion, it is unnecessary to state the evidence in the light most favorable to respondent. Rather, in order that we can properly appraise the effect of the exclusion of admissible evidence favorable to appellant, it is necessary to set forth in some detail his version of the killing and the circumstances which led up to it. (See *People* v. *Dail* (1943), 22 Cal.2d 642, 650 [1] [140 P.2d 828].) Such version is as follows:

Defendant met Shayne in 1952 when defendant borrowed $1,400 from Shayne to complete construction of a house. Shayne told defendant that the financing "was going through the FHA." (As is hereinafter stated, Shayne was subsequently convicted of fraud in connection with FHA transactions.) In 1954 defendant had also borrowed $350 from Shayne in connection with the proposed purchase of a service station. The trial court struck defendant's testimony that defendant's wife discovered that Shayne's interest charges on the loans were exorbitant and that defendant complained of this to the Better Business Bureau.

On the day of the killing, September 29, 1957, Shayne came to defendant's house and told defendant, "I think I have got a job for you." Shayne further told defendant that Shayne and his brother had been "convicted by the federal government," had appealed, and needed money. Defendant had not repaid Shayne the $350 but this had been "discharged in bankruptcy." Shayne, however, "explained the bankruptcy was only to give a person time to do something." Defendant stated that he had been ill (defendant is an epileptic) and unable to work but "would be glad to start giving him some money" when he was able to work.

Shayne further "told me if his brother went to prison that he would take care of me and my family. . . . He asked me had I been subpoenaed in court and I told him no. He thought

that was funny because I had already turned him in to the Better Business Bureau.''

Shayne asked defendant to enter Shayne's sedan. Defendant got into the back of the car. Shayne drove about, stopped to make a telephone call, and thereafter stopped at a rather isolated spot. He told defendant that he wanted defendant ''to rough up a couple of guys for me.'' Although defendant protested that he wanted ''nothing to do with nothing like that,'' Shayne persisted in his attempts to induce defendant to agree to ''rough up'' someone for pay. It developed that Shayne wished himself ''roughed up.'' He said, ''to me it wouldn't make no difference because I have only got about six months to live.'' Defendant asked Shayne why, if he wished to die, he did not take poison. Shayne replied, ''it can't look like suicide. It have to look like a murder or accident.'' Shayne suggested that defendant strangle him and give the killing the appearance of ''murder-robbery.'' Defendant protested. Shayne put his wallet, rings, and watch in defendant's shirt pocket and warned defendant to hide the jewelry because it was readily identifiable as Shayne's. Shayne put ten $100 bills on the seat of the car. Defendant ''began to think then that he was actually serious, and I reached for the door to open it to get out, and that is when he caught me, pulling me back into the car, and he busted my shirt loose . . .; he had really a horrible look on his face. I said, 'Mr. Shayne, I told you I wasn't going to have nothing to do with nothing like that. . . . I am going home.' He say, 'You can't go now; you have got my money.' ''

Defendant then put a cord or strap which had become detached from the back seat of the car around Shayne's neck, Shayne adjusted it, and defendant began to choke Shayne, then became frightened and released the pressure. Shayne said, ''Come on, let's get it over with.'' Defendant again choked Shayne. Shayne ''was fumbling on the seat.'' Defendant was afraid of Shayne because ''I felt that the man could have been armed, he could have had a gun, anything. Then my intentions was to hold that strap on him until he became unconscious.'' When Shayne ''went into a slump'' defendant removed the strap. Defendant wiped off the part of the car where he had been sitting ''because I am feeling that if the man becomes to be conscious he is really mad at me and in his state of mind he would probably try to get the police to come out to my house and press some kind of charge against me which was not true.'' Also defendant was afraid of ''a

syndicate.'' Defendant picked up the $1,000 which was lying, with some handkerchiefs, on the front seat. Defendant knotted two handkerchiefs about Shayne's neck so that ''if he comes to he will have some evidence here that actually what he wanted did I started to do.'' Defendant then left.

After defendant returned to his home he took the jewelry from his shirt pocket without touching it with his bare hands, ''figuring, as I afore stated, that he [Shayne] would be angry with me, and I wanted to handle it with care, to take it out of my pocket so my hands wouldn't be all over it, and if he would try to start trouble for me, well, I could have evidence right here that I had not had my hands on that stuff.'' Defendant put the jewelry in two cans, placed them in his yard, and covered them with leaves. (According to one of the investigating officers, when defendant, after he had given various false and incomplete statements, ''decided that he would show us where the jewelry was,'' defendant asked the officers, ''Please do not touch the jewelry because it will show only Shayne's fingerprints on it.'')

Defendant's manifest naiveté and lack of judgment may have led him to invent the above account of Shayne's death and defendant's possession of Shayne's property in the belief that such account would exonerate defendant; on the other hand Shayne, recognizing such naiveté and lack of judgment, may have exploited defendant in the manner which defendant recounted. ▐ Defendant's obvious mental weakness and the unusual nature of his story make it more, not less, important that he be accorded full opportunity to corroborate that story by any available admissible evidence.

▐ A material issue in the case was whether defendant murdered Shayne in the perpetration of robbery and, particularly, whether defendant took Shayne's property ''against his will, . . . by means of force or fear'' (Pen. Code, § 211). Relevant to this issue is evidence that defendant strangled Shayne and took his property at Shayne's request. Tending to show that Shayne would be likely to, and did, make such a request was evidence that Shayne had substantial reasons for wishing to die, and for wishing to die in circumstances which would give the appearance of murder in the perpetration of robbery. The fact that Shayne faced the possibility of imprisonment furnishes a motive for his desiring death. The fact that a few days before he assertedly requested defendant to strangle him he had purchased a large life insurance policy with a

suicide clause furnishes a motive for his wishing to die in the circumstances of his asserted request.

In accord with the above outlined theory of relevance, defendant, to show "the motive for wanting himself [Shayne] killed instead of having it look like suicide," offered in evidence the life insurance policy purchased by Shayne some 10 days before his death; the policy was in the sum of $250,000 and provided that in the event of suicide of the insured within two years of issue the liability of the insurer was limited to premiums paid. The trial judge sustained the People's objection to this evidence. The People urge that the evidence is irrelevant because defendant did not know of the insurance at the time he strangled Shayne. But the fact that *defendant* did not act with the insurance in mind does not at all affect the relevance of the evidence to *Shayne's* state of mind, and the probability that he asked defendant to strangle him. Furthermore, the fact that defendant, until after he had told his naive story of Shayne's request, did not know of the existence of the large insurance policy with its suicide exclusion clause, would in itself appear to suggest truth as the most logical explanation for an otherwise uncanny coincidence of fact and fiction.

The People also urge that the exclusion of the evidence of insurance, even if it was error, was not prejudicial because such evidence would have been only cumulative to testimony of the witness Hersch that Shayne, two days before his death, told Hersch that Shayne had just taken out an insurance policy which named his wife as beneficiary and that Shayne expressed concern as to whether the proceeds of the policy were subject to inheritance tax. Defendant's offered and excluded evidence as to the policy was more than merely cumulative of Mr. Hersch's testimony. The excluded evidence would have established that Shayne in fact had purchased the policy, that it was for $250,000, and that it provided for limitation of liability in the event of suicide of the insured. Certainly these latter facts would be much more impressive than the testimony of Hersch in tending to show Shayne's possible state of mind, and therefore the probability of his request to defendant, concerning the manner of his death.

Defendant further offered, and the trial judge refused to admit, a certified copy of a record of the United States District Court showing that Shayne, on October 8, 1956, had been convicted of seven counts of felony (frauds connected with the Federal Housing Administration) and sentenced to im-

prisonment. This evidence was offered as "a part of the motive for the death." The People urge that such evidence is irrelevant because defendant would not be relieved from responsibility for first degree murder by showing that he killed Shayne at his request so that Shayne would not have to serve prison sentences. The prosecution presented evidence tending to show one or both of two types of first degree murder; i.e., murder in the perpetration of robbery, or by willful, deliberate, and premeditated killing. It may be assumed that the jury found defendant guilty of robbery-murder, for they found him guilty of robbery. As has been pointed out, the evidence as to Shayne's sentences is relevant to robbery-murder and the separately charged crime of robbery; such evidence tends to absolve defendant of robbery by tending to show that Shayne had a motive for asking, and therefore may well have asked, defendant to choke him and take his property.

■ And it cannot properly be said that the exclusion of this evidence, relevant to robbery, was harmless upon the assumption that the jury found defendant guilty of willful, deliberate and premeditated murder, for we cannot assume that the jury could not have believed defendant's testimony to the effect that his final choking of Shayne was not with intent to kill but, under the influence of panic, with intent to render Shayne unconscious.

■ The People further argue that the exclusion of the record of Shayne's federal conviction and sentences was not prejudicial because that evidence was cumulative to testimony of an investigating officer that defendant said that Shayne had stated that he was under a five-year prison sentence, testimony of defendant that Shayne had said that he had suffered a federal conviction and had appealed, and testimony of Attorney Morris Lavine that Shayne had suffered a federal conviction and that Mr. Lavine was representing him on appeal. However, the rejected record of the federal convictions of seven felonies would have come in as part of defendant's case and at that stage of the trial shown the probability that defendant was not manufacturing his assertions that Shayne had stated that he had been convicted, whereas Mr. Lavine's testimony was no doubt less effective for the defendant, since it was part of the People's rebuttal and was coupled with testimony that Mr. Lavine and Shayne expressed optimism as to obtaining a reversal on appeal.

■ Also the People suggest that lack of prejudice in the exclusion of evidence as to Shayne's insurance and conviction

is shown by the fact that defense counsel argued concerning those subjects to the jury. But argument is not evidence; the jury were so instructed; and defense counsel could not properly and did not argue the significance of the erroneously excluded evidence as to the amount and the suicide clause of the insurance policy.

Not only is the excluded evidence relevant and important on the essential questions of robbery, of the specific intent to kill, and of the deliberation and premeditation with which such intent, if any, was formed; also it might well have been significant upon the question of penalty if the jury had properly found defendant guilty of first degree murder. Defendant did not renew his offer of such evidence during the separate proceedings on the issue of penalty (Pen. Code, § 190.1) but in view of its rejection at the first stage of the trial we do not believe that such renewal is a prerequisite to defendant's maintaining the contention that the receipt of such evidence might well have influenced the jury to choose the lesser penalty.

In support of his motion for new trial defendant presented affidavits of asserted newly discovered evidence that Shayne shortly before his death requested an acquaintance to introduce him to some "shady character" who would "do a job" in connection with a large insurance policy which Shayne had recently purchased, and that Shayne said that he was depressed because of his convictions and was worth more dead than alive. From the above discussion concerning the relevance and import of the rejected evidence concerning the insurance and the convictions it is apparent that such newly discovered evidence of Shayne's state of mind will be admissible upon a new trial.

Defendant contends that the trial judge erred in refusing his requested instructions based upon section 401 of the Penal Code. That section provides, "Every person who deliberately aids, or advises, or encourages another to commit suicide, is guilty of a felony." It is defendant's position that (assuming that the jury believed his testimony) he could be guilty only of violation of section 401 (added, Code Amdts. 1873-1874, p. 433), not of murder (defined by Pen. Code, §§ 187-189, enacted 1872), because section 401 is a later enacted statute specifically related to, and therefore governing, conduct such as that of defendant here.

Rather, the reasoning of *State* v. *Bouse* (1953), 199 Ore. 676, 702-703 [264 P.2d 800, 812 [23-25]], is applicable.

There defendant's wife was found drowned beside a bathtub which contained water. There was evidence that she had told defendant that she wished to die. Upon the evidence the jury could have determined that defendant put her in the tub and, despite her struggles, held her head under water until she drowned, or they could have determined that if defendant participated in her death at all he did no more than run the water into the tub and assist his wife to get into it. The reviewing court concluded that the trial court correctly instructed the jury in the following statutory language (§ 23-407, O.C.L.A.): "If any person shall purposely and deliberately procure another to commit self-murder, or assist another in the commission thereof, such person shall be deemed guilty of manslaughter." But, the court said, "Contrary to the claims of defendant's counsel, the statute [just quoted] does not contemplate active participation by one in the overt act directly causing death. It contemplates some participation in the events leading up to the commission of the final overt act, such as furnishing the means for bringing about death,—the gun, the knife, the poison, or providing the water, for the use of the person who himself commits the act of self-murder. But where a person actually performs, or actively assists in performing, the overt act resulting in death, such as shooting or stabbing the victim, administering the poison, or holding one under water until death takes place by drowning, his act constitutes murder, and it is wholly immaterial whether this act is committed pursuant to an agreement with the victim, such as a mutual suicide pact."

Here defendant by his own account actively strangled Shayne and, although defendant indicated that he did not intend to kill Shayne and did not believe that he had done so, the only reasonable view of the evidence is that Shayne was fatally choked by defendant. In these circumstances the instructions based upon Penal Code, section 401, were properly refused.

Defendant urges that the trial judge of his own motion should have instructed the jury concerning the crime of theft, an offense which as a matter of law is necessarily included in the charged crime of robbery. However, there was no direct evidence of the lesser offense of theft. It is elementary that the taking of property is not theft in the absence of an intent to steal (*People* v. *Coon* (1940), 38 Cal. App.2d 512, 516 [101 P.2d 565]; *People* v. *Banks* (1953), 120 Cal.App.2d Supp. 921, 922 [1] [261 P.2d 362]), and according

to defendant's testimony he did not intend to steal the property but took it in compliance with Shayne's express request. ▆ Defendant could have been guilty of theft only if he first strangled Shayne and then formed the intent to and did steal. The physical facts of the killing would support an inference that it was in the perpetration of robbery; they do not in themselves suggest a killing followed by the formation of an independent intent to steal. ▆▆ Although the jury could have accepted portions of defendant's testimony and statements, disbelieved other portions (*People* v. *Davis* (1957), 48 Cal.2d 241, 248 [1] [309 P.2d 1]; *People* v. *Johnston* (1957), 48 Cal.2d 78, 83 [2] [307 P.2d 921]), and determined that defendant first strangled Shayne and then formed the intent to steal, upon the present record there was no occasion for the trial court of its own motion to instruct concerning grand theft. (*Cf. People* v. *Carnine* (1953), 41 Cal.2d 384, 389 [260 P.2d 16].)

Defendant contends that due process was violated by the admission in evidence of confessions obtained by psychological coercion. The extrajudicial statements of defendant, termed "confessions" by counsel, were made in the following circumstances:

Police investigation of Shayne's death led officers to defendant at his home at 5:30 p. m. on Monday, September 30, 1957. Defendant then said that he had seen Shayne the previous day but had not entered his automobile. The officers "asked the defendant to accompany us to the police station, which he did, for the purpose of fingerprinting and one thing and another." Defendant was questioned intermittently from 6 p. m. until 3 a. m. the next morning. During this period, defendant testified, he was from time to time put in a cell and "As soon as I thought I was going to sleep they would call me right back and they would keep me about an hour and a half or two hours"; in the morning for an unspecified time "they had me in what you would call the hold, where you make no communication with nobody, and they take your shoes away from you, and that is all that was in there, just a piece of board to lay on." At 5 p. m. on October 1 the officers took from defendant a "formal [stenographically reported] statement" in which he again denied having been in Shayne's car.

On October 2, 1957, at 8 a. m. defendant asked to talk with a detective and gave a second "formal statement" in which he said that Shayne paid him $1,000 to "rough him up," that defendant became frightened and tried to leave the car, that

Shayne "grabbed" him and he strangled Shayne. In this statement defendant did not mention Shayne's jewelry.

Defendant was then questioned until 5 p. m.; during this questioning an officer told defendant "that if he didn't tell us where the jewelry was we would probably have to bring the rest of the family in until we get this straightened out." At 5 p. m. on October 2 defendant directed and accompanied the officers to the yard of his home where he had hidden the jewelry. They returned to the police station and at 6:45 p. m. defendant gave his third "formal statement," amplifying his second statement, emphasizing that the strangling was at Shayne's request, and asserting that Shayne had given defendant the jewelry.

In violation of Penal Code, section 825,[1] defendant was not arraigned until the afternoon of October 3. At 4:30 p. m. on October 4 he made a fourth "formal statement" further amplifying his previous incriminatory statements.

In addition to the foregoing uncontradicted evidence we consider the fact that the record shows defendant's lack of education and mental weakness. His counsel also emphasizes that there is no evidence that the police officers informed defendant of the privilege against self-incrimination or of the right to counsel.

■ In our appraisal of the totality of the circumstances in which defendant's statements were made, the following holdings are pertinent: "[A] confession is not rendered inadmissible by a failure to advise a suspect of his right to remain silent, of his right to counsel and that his statements may be used against him [citation], or by an absence of a suspect's counsel and friends [citation], or by a delayed detention, where the confession is not the product of that detention [citation] or by a low emotional and mental stability on the part of the suspect if he is nevertheless capable of understanding the meaning and effect of his confession [citation]. Such matters may be taken into consideration in determining whether a particular confession was voluntarily made." (*People* v. *Tipton* (1957), 48 Cal.2d 389, 393-394 [4] [309 P.2d 813].) ■ Also to be considered in determining whether a confession was voluntary, but not necessarily to be accepted as establishing that it was coerced, are the facts that defendant was questioned extensively (*Stein* v. *New York*

[1]Pen. Code, § 825: "The defendant must in all cases be taken before the magistrate without unnecessary delay, and, in any event, within two days after his arrest, excluding Sundays and holidays . . ."

(1953), 346 U.S. 156, 184-185 [73 S.Ct. 1077, 97 L.Ed. 1522])
and for a time was held incommunicado (*People* v. *Nagle*
(1944), 25 Cal.2d 216, 224 [153 P.2d 344]).

A serious question is presented by the threat of an officer
to "bring the rest of the family in" which was expressly made
in order to, and did, induce defendant to "tell us where the
jewelry was." A confession coerced by a threat to
arrest a near relative is not admissible. (*People* v. *Shelton*
(1957), 151 Cal.App.2d 587, 588 [2] [311 P.2d 859]; *People*
v. *Mellus* (1933), 134 Cal.App. 219, 225 [25 P.2d 237].)
Contrary to the People's argument, the situation here is .
not susceptible of the interpretation that defendant led the
officers to the jewelry in the mere hope, not induced by threat
or promise, that consideration would be shown to defendant's
friends or family. (*Cf. People* v. *Nagle* (1944), *supra*, 25 Cal..
2d 216, 224-225 [5]; *People* v. *Abbott* (1958), 156 Cal.App.2d
601, 604-605 [319 P.2d 664]; *People* v. *Newman* (1954), 127
Cal.App.2d 430, 434 [2, 3] [273 P.2d 917].) Nor are
we impressed by holdings that evidence of physical facts dis-
covered by aid of a coerced confession, and so much of the
confession as relates to the discovery of those facts, are admis-
sible because the physical facts preclude the possibility of
the confession being false. (*People* v. *Castello* (1924), 194
Cal. 595, 601 [4] [229 P. 855]; *People* v. *Murphy* (1873), 47
Cal. 103, 105; *People* v. *Hoy Yen* (1867), 34 Cal. 176, 177;
*People* v. *Ah Ki* (1862), 20 Cal. 177, 179.) Real evidence
may be discovered in circumstances which show defend-
ant's guilt without any substantial question whatsoever, yet
convictions obtained by such evidence may be stricken down
because of the requirements of due process or of court-made
rules of evidence based upon the court's refusal to condone,
and thereby in effect encourage, official flouting of the law.
(*Rochin* v. *California* (1952), 342 U.S. 165, 172 [72 S.Ct.
205, 96 L.Ed. 183, 25 A.L.R.2d 1396]; see also opinions of the
District Court of Appeal, and opinions of dissenting justices
on denial of hearing in California Supreme Court, in *People*
v. *Rochin* (1950), 101 Cal.App.2d 140 [225 P.2d 1, 913];
*Anderson* v. *United States* (1943), 318 U.S. 350 [63 S.Ct. 599,
87 L.Ed. 829], reversing *Anderson* v. *United States* (1941),
124 F.2d 58, 66 [13, 15]; *People* v. *Cahan* (1955), 44 Cal.2d
434, 445-449 [282 P.2d 905].) In the whole circum-
stances of this case, however, we conclude that on the present
record neither the threat alone nor its combination with the
other circumstances in which defendant gave his statements

was as a matter of law so inherently coercive as to require that we reject the officers' testimony that the statements were freely made, or that we now hold that the jewelry discovered as a result of the threat must be inadmissible upon a new trial.

Defendant asserts that the prosecuting attorney was guilty of "flagrant" misconduct. We do not believe that this characterization is warranted and, since the matters of which defendant complains will probably not recur, we need not discuss them in detail.

■■ While the errors in the proceedings on the homicide count appear to go only to the validity of the finding that the murder was of the first degree (and to the selection of penalty), and the evidence strongly supports a determination that the homicide was murder of the second degree, this is not a case which can properly be disposed of on appeal by reduction of the degree of the homicide and affirmance as modified. On the record this court cannot hold that the evidence is insufficient to sustain the determinations of the trier of fact that the defendant committed robbery, that the homicide was murder, and that the murder was of the first degree. ■■ Although on proper motion a trial court can (and must) pass upon the weight of the evidence in determining whether convictions should be reduced in degree or class (*People* v. *Borchers* (1958), 50 Cal.2d 321, 328 [1, 2] 330 [9, 10] [325 P.2d 97]; *People* v. *Sheran* (1957), 49 Cal.2d 101, 109 [6] [315 P.2d 5]; *People* v. *Todd* (1957), 154 Cal.App.2d 601, 608 [6-8] [317 P.2d 40]), the power of this court to decree a reduction can be exercised only where it finds the evidence to be as a matter of law insufficient to sustain the essential finding (*People* v. *Deloney* (1953), 41 Cal.2d 832, 837 [1] [264 P.2d 532]; *People* v. *Thomas* (1945), 25 Cal.2d 880, 904-905 [22, 23] [156 P.2d 7]).

For the reasons above stated, the judgment and the order denying a new trial are reversed and the cause is remanded for a new trial.

Gibson, C. J., Shenk, J., Carter, J., Traynor, J., and Spence, J., concurred.

McComb, J., dissented.