Filed 12/10/14  P. v. Beltran CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D066357 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. FVA801476) |
| FIDEL BELTRAN, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Bernardino County, Ronald M. Christianson, Judge.  Affirmed.

Ellen M. Matsumoto, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Kristine A. Gutierrez and Lynne G. McGinnis, Deputy Attorneys General, for Plaintiff and Respondent.

In this case, which involves what defendant Fidel Beltran refers to as his "mercy killing" of his friend and coworker, Baraquel Alonzo Cruz, the San Bernardino County

District Attorney filed an information in June 2009 charging Beltran with (1) murder (count 1: Pen. Code,[1] § 187, subd. (a)); (2) making a criminal threat (count 2: § 422; alleged victim: Jose Jesus Hernandez); and (3) dissuading a witness (Jose Jesus Hernandez) (count 3: § 136.1, subd. (c)(l)). As to count 1, the information alleged that, in committing the murder, Beltran personally and intentionally discharged a firearm causing great bodily injury and death within the meaning of section 12022.53, subdivision (d) (hereafter section 12022.53(d)); he personally and intentionally discharged a firearm within the meaning of section 12022.53, subdivision (c) (hereafter section 12022.53(c)); and he personally used a firearm within the meaning of section 12022.53, subdivision (b) (hereafter section 12022.53(b)).

At the close of the evidence phase of the trial, the court granted Beltran's section 1118.1 motion for acquittal as to count 2 (making a criminal threat) and dismissed that count.

The jury found Beltran guilty of second degree murder as a lesser included offense of count 1 and found to be true all three of the firearm enhancements. The jury found Beltran not guilty of dissuading a witness.

The court thereafter sentenced Beltran to an aggregate prison term of 40 years to life, consisting of an indeterminate term of 15 years to life for the second degree murder conviction, plus a consecutive indeterminate term of 25 years to life for the section 12022.53(d) firearm enhancement.

---

[1] All further statutory references are to the Penal Code.

2

Beltran raises two contentions on appeal. First, he contends his second degree murder conviction must be reversed because the victim, Cruz, was Beltran's friend; Cruz asked him to assist him in committing suicide by shooting him; and, thus, the court prejudicially erred by denying his request for a jury instruction on the law of voluntary manslaughter as a lesser included offense of murder based on the absence of malice.

Second, Beltran contends that, if this court affirms his murder conviction, the section 12022.53(d) firearm enhancement of 25 years to life must be stricken, and a determinate term of 20 years imposed in its place under section 12022.53(c) because (1) "the plain language of [section 12022.53(d)] indicates that it applies 'to any person other than an accomplice,'" (2) Cruz was an accomplice because he "was an aider and abettor as well as a coconspirator to the crime of his killing" in that "[he] asked [Beltran] to kill him," and thus (3) the court erred in preventing the jury from determining whether Cruz was an accomplice by modifying the jury instruction on section 12022.53(d) "by eliminating the need for the jury to determine whether Cruz was 'any person other than an accomplice.'"

For reasons we shall explain, we affirm both Beltran's murder conviction and the related section 12022.53(d) firearm enhancement. Accordingly, we affirm the judgment.

3

FACTUAL BACKGROUND

A. *The People's Case*

On August 13, 2008,[2] at around 7:30 p.m., officers from the San Bernardino County Sheriff's Department were dispatched to a remote dirt road in an unincorporated area of Fontana. There they found a man's body lying face up on the ground. The man was wearing construction boots, blue jeans, and a long-sleeved T-shirt containing the emblem, "MJW Concrete." The deceased was later identified as Baraquel Alonzo Cruz, who was born in early 1954.

The scene was processed for evidence and investigators found an expended nine-millimeter cartridge casing five to six feet away from Cruz's body. Cruz's body was transported to the coroner's office for an autopsy.

Steven Trenkle, a forensic pathologist, performed the autopsy and determined that a bullet entered Cruz's mouth, passed through the cervical spine, and exited through the back of his neck. Dr. Trenkle determined that the cause of death was the gunshot wound to the head and neck. He opined that a person sustaining such an injury would be dead within a matter of minutes absent immediate medical intervention. Sergeant David Burgess and Detectives Jon Minard and Scott Landen went to MJW Concrete and spoke to Jose Jesus Hernandez. Hernandez, Beltran, and Cruz worked together at MJW. According to Hernandez, he, Beltran, Cruz, and two other workers were at a construction job site in Yorba Linda on August 12. Beltran had driven the group to that site in the

---

[2] All further dates are to calendar year 2008 unless otherwise specified.

company truck and the job ended at 3:30 p.m. On the way back, after Beltran dropped the other two workers off at their homes, Hernandez heard Cruz complaining to Beltran about his family and his problems. When Beltran stopped at a gas station, Cruz said he was having problems with his daughters. He told Beltran he would be very grateful if Beltran killed him. When Cruz went inside the gas station, Beltran told Hernandez that Cruz was "playing with fire" and that he (Beltran) "could do something." Hernandez, who was in the truck with Beltran, told Beltran to pay no attention to Cruz because Cruz was "crazy." After they left the gas station, Beltran dropped Hernandez off at his house and then drove away with Cruz. Cruz answered the phone and Hernandez heard Beltran's voice in the background.

The next day, August 13, Hernandez was scheduled to work with Cruz and Beltran at a job site in Temecula. Beltran was supposed to drive Cruz to the site, but Cruz did not show up for work. When Hernandez asked Beltran about Cruz, Beltran told Hernandez that after he took Hernandez home, Cruz drank some beer, he drove Cruz to his girlfriend's house, Cruz agreed to go to the yard, but Cruz never arrived. Hernandez called Cruz many times, but he did not answer.

Hernandez testified that on August 19 Beltran admitted to him at work that he had killed Cruz. Beltran told Hernandez that he did not feel bad about what happened; he did not feel any regret.

While the officers were at MJW, they also spoke to Beltran. Beltran agreed to accompany Sergeant Burgess and Detective Minard to the sheriff's headquarters to be interviewed. Detective Minard asked Beltran when he last saw Cruz. Beltran said that

5

while he and Cruz were working, Cruz told him he wanted to kill himself. Cruz did not explain why; he just said he was "fed up with life." When asked whether he killed Cruz, Beltran replied, "No, I didn't kill him." Beltran stated he "wasn't there" and he "didn't do it."

Following further questioning, Detective Minard told Beltran he was under arrest for killing Cruz and advised Beltran of his *Miranda*[3] rights. Beltran stated that he understood his rights and indicated he was willing to talk about what had happened to Cruz. Beltran said that Cruz was his friend, and Cruz asked him to kill him because he was fed up with life. Cruz told Beltran that he picked oranges when he was younger and he worked better than everyone else, but when he got older everyone beat him at the job, he earned less money, and he got depressed. Beltran said Cruz had told him that when he turned 54 he was going to take his own life by swallowing poison. Beltran said he told Cruz that whenever he decided he wanted to die, he would do that "favor" and kill him.

Beltran also told Detective Minard that while he, Hernandez, and Cruz were at the job site in Yorba Linda on August 12, Cruz asked him to shoot him. Beltran said that Hernandez was present when Cruz asked him (Beltran) to kill him. On the way home from work, Cruz again asked Beltran to kill him. Beltran also indicated that, once he was alone with Cruz in the truck at a gas station, Cruz again asked him to kill him. Cruz told him he was fed up with life and said he had a daughter who was a Jehovah's Witness and

---

3 *Miranda v. Arizona* (1966) 384 U.S. 436.

had not spoken to him in a long time. He also said his wife only spoke to him because he sent her money.

During the interview, Beltran also stated that after he took Hernandez home, he drove Cruz to the location where he killed him. Beltran's Colt nine-millimeter handgun was on the seat and Cruz saw it. Beltran said he asked Cruz whether he was sure he wanted to be killed, and Cruz said, "yes." According to Beltran, Cruz said he wanted the gun to be "emptied all in his chest." Beltran stated that, when he and Cruz got out of the truck, he asked Cruz again if he was sure this is what he wanted, and Cruz responded, "Yes, . . . do it." Beltran then admitted that he killed Cruz by shooting him once in the head. Beltran said he left the gun near Cruz's body and drove home. Beltran added that he was "at peace" with killing Cruz because it was "a death that [Cruz] wanted," not one that he [Beltran] wanted.

B. *The Defense*

Testifying for the defense, Sergeant Daniel Finneran indicated that he responded to the scene of the killing during the evening on August 13. He stated that "it did not appear to [him] as if the body had been there for an extended period of time."

Vincent Sghiatti, a physician and general family medicine practitioner, testified he was retained by the defense to ascertain the time of death. From his review of the records, he opined that Cruz died the afternoon of August 13 between 2:00 and 6:00 p.m.

Several individuals who knew Beltran and Cruz testified that Beltran was honest, hard working, nonviolent and that he and Cruz had a good relationship.

7

DISCUSSION

I. *CLAIM OF INSTRUCTIONAL ERROR* (*COUNT 1*)

Beltran first contends his second degree murder conviction must be reversed because (1) Cruz, was Beltran's friend; (2) Cruz asked him to assist him in committing suicide by shooting him, and, thus, (3) the court prejudicially erred by denying his request for a jury instruction on the law of voluntary manslaughter as a lesser included offense of murder based on the absence of malice. We reject this contention.

A. *Background*

As pertinent here, defense counsel submitted two proposed special instructions. The first, proposed special instruction No. 1, provided:

> "A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed someone *without malice*.
>
> "You have heard evidence that the defendant killed the decedent at the decedent's request. You are the exclusive judges of whether or not the defendant killed the decedent, and if so, whether the defendant killed the decedent at the decedent's request.
>
> "If you find that the defendant killed the decedent at the decedent's request, you may find that the killing was committed *without malice*.
>
> "The People have the burden of proving beyond a reasonable doubt that the defendant killed the decedent and did so with malice. If the People have not met this burden, you must find the defendant not guilty of murder.
>
> "You should then deliberate whether the defendant is guilty of manslaughter." (Italics added.)

The second instruction requested by Beltran's counsel, proposed special instruction No. 5, provided:

8

"You have heard evidence that the defendant killed the decedent at the decedent's request. You are the exclusive judges of whether the defendant killed the decedent, and if so, whether the defendant killed the decedent at the decedent's request. If you find that the defendant killed the decedent at the decedent's request, you may find that the fact that the killing was committed at the decedent's request *negates any express or implied malice* on the part of the defendant." (Italics added.)

At a jury instruction conference, in support of his request that the court give these proposed instructions to the jury, Beltran's counsel argued that the California Supreme Court "apparently ha[d] not addressed" the question of whether a killing carried out at the request of the victim "should act to obviate malice," thereby reducing the crime of murder to that of voluntary manslaughter.

The court denied defense counsel's request, responding that the proposed instructions "fl[y] in the face" of the Supreme Court's decision in *People v. Matlock* (1959) 51 Cal.2d 682 (*Matlock*).

B. *Analysis*

In his opening brief, Beltran correctly acknowledges that "the current law does not support his contention that his mercy killing of his friend [(Cruz)] at his friend's request was an act less than murder due to the absence of malice." Indeed, *Matlock, supra*, 51 Cal.2d 682—which the court cited in denying defense counsel's request that proposed special instructions Nos. 1 and 5 be given to the jury—is virtually on point. In *Matlock*, the California Supreme Court was presented with the issue of whether someone who actively participates in the final overt act that causes the death of a suicide victim—at the victim's request (see *id*. at p. 687)—is guilty of murder or may be found guilty of the

9

felony offense of deliberately aiding, advising, or encouraging the victim to commit suicide in violation of section 401.[4] (*Matlock, supra,* 51 Cal.2d at pp. 693-694.) The defendant in that case admitted that he strangled the victim and took the victim's money, claiming he did so at the victim's request because the victim told him he only had six months to live and wanted to die in a way that appeared to be a "murder-robbery" in order to avoid forfeiting the benefits of his insurance policy. (*Id.* at pp. 689, 694.) A jury found the defendant guilty of first degree murder and second degree robbery. (*Id.* at p. 687.)

On appeal, the *Matlock* defendant acknowledged he could be guilty of aiding suicide in violation of section 401, but claimed he could not be guilty of murder, and thus the trial court erred in refusing his requested jury instructions based on section 401. (*Matlock, supra,* 51 Cal.2d at p. 693.) Rejecting these claims, the Supreme Court held that, "[i]n these circumstances," the trial court properly refused to give the instruction based on section 401 because the defendant's active participation in the final overt act causing the victim's death barred the application of section 401. (*Matlock, supra,* 51 Cal.2d at p. 694; see *In re Joseph G.* (1983) 34 Cal.3d 429, 435 [stating that, in *Matlock,* "we held that the defendant's active participation in the final overt act causing the victim's death, i.e., strangling him, precluded the application of the aiding suicide statute [(§ 401)]"].) The *Matlock* court explained that the defendant's active participation in the

---

4       Section 401 provides:  "Every person who deliberately aids, or advises, or encourages another to commit suicide, is guilty of a felony."

overt act that resulted in the victim's death "constitute[d] murder," and it was "wholly immaterial" that the defendant acted at the request of the victim:

> "'[*W*]*here a person actually performs, or actively assists in performing, the overt act resulting in death, such as shooting* or stabbing *the victim*, administering the poison, or holding one under water until death takes place by drowning, *his act constitutes murder*, and *it is wholly immaterial whether this act is committed pursuant to an agreement with the victim*, such as a mutual suicide pact.'" (*Matlock, supra,* 51 Cal.2d at p. 694, italics added.)

We addressed *Matlock* in *People v. Cleaves* (1991) 229 Cal.App.3d 367 (*Cleaves*), which also is virtually on point. In *Cleaves*, the accused's defense to a murder charge was that he killed the victim, who was suffering from AIDS, at the victim's request to relieve the victim's suffering. (*Id.* at pp. 372-373.) Pursuant to the victim's request, the defendant assisted him in strangling himself. (*Ibid.*) At trial the court instructed the jury on first and second degree murder only, refusing to instruct the jury on the lesser related offense of aiding and abetting suicide, and also refusing to instruct the jury on voluntary and involuntary manslaughter. (*Id.* at pp. 374-375.) The jury found the defendant guilty of second degree murder, and he appealed to this court. (*Id.* at p. 371.)

Relying on *Matlock*, the *Cleaves* defendant claimed on appeal that the facts supported a jury instruction on a lesser related offense of voluntary manslaughter based on his asserted lack of malice. (*Cleaves, supra,* 229 Cal.App.3d at pp. 371, 376.) Citing *Matlock* we rejected that claim, stating:

> "[*Defendant*] *asks us to fashion a manslaughter crime for a killing done at the victim's request, based on the absence of malice,* which does not now expressly exist under California law. . . . As recognized by [the defendant], our Supreme Court in [*Matlock*], *supra,* 51 Cal.2d at page 694, defined a killing pursuant to an

11

agreement with the victim as murder. Although *Matlock* does not address the absence of malice issue, as a lower tribunal we decline to deviate from the parameters of *Matlock*." (*Cleaves, supra,* 229 Cal.App.3d at p. 376, citing *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

We also stated in *Cleaves* that "[w]e leave it to our Supreme Court to resolve whether it is appropriate to examine the malice issue as it pertains to a killing at the victim's request." (*Cleaves, supra,* 229 Cal.App.3d at p. 377.)

Here, we are constrained—as we were in *Cleaves*—by the California Supreme Court's holdings in *Matlock, supra,* 51 Cal.2d at page 694, that an unlawful homicide committed by a defendant who claims the offense was a mercy killing done at the request of the victim is murder, and that it is wholly immaterial whether the defendant's active participation in the overt act resulting in the victim's death took place pursuant to an agreement with the victim. (*Auto Equity Sales, Inc. v. Superior Court, supra*, 57 Cal.2d at p. 455.) Accordingly, we affirm Beltran's conviction of second degree murder.

## II. *SECTION 12022.53(d) FIREARM ENHANCEMENT*

Beltran alternatively contends that, if this court affirms his murder conviction, the consecutive sentence enhancement of 25 years to life imposed under section 12022.53(d)[5] (for discharging a firearm, causing death, during the commission of the

---

5    When Beltran murdered Cruz in 2008, former section 12022.53(d) provided: "Notwithstanding any other provision of law, any person who, in the commission of a felony specified in subdivision (a), Section 246, or subdivision (c) or (d) of Section 12034, personally and intentionally discharges a firearm and proximately causes great bodily injury, as defined in Section 12022.7, or death, to any person other than an accomplice, shall be punished by an additional and consecutive term of imprisonment in the state prison for 25 years to life." (Stats. 2006, ch. 901, § 11.1.) In 2010, former

12

murder) must be stricken and a determinate term of 20 years imposed in its place under section 12022.53(c) because (1) "the plain language of [section 12022.53(d)] indicates that it applies 'to any person *other than an accomplice*'" (italics added); (2) *Cruz was an accomplice* because he "was an aider and abettor as well as a coconspirator to the crime of his killing" in that "[he] asked [Beltran] to kill him"; and, thus, (3) the court erred in preventing the jury from determining whether Cruz was an accomplice by modifying CALCRIM No. 3149—the standard jury instruction on section 12022.53(d)—"by eliminating the need for the jury to determine whether Cruz was 'any person other than an accomplice.'"

We reject this contention and affirm the section 12022.53(d) firearm enhancement because (1) Cruz could not have been charged with murder or any other crime had he survived the shooting; and, thus, (2) Cruz was *not* an accomplice within the meaning of the accomplice exception to that firearm enhancement as a matter of law.

A. *Background*

1. *Section 12022.53(d) firearm enhancement allegation*

As to the murder offense, the information alleged that Beltran, in committing the murder, personally and intentionally discharged a firearm causing great bodily injury and death to the victim (Cruz) within the meaning of the firearm enhancement set forth in section 12022.53(d).

---

section 12022.53(d) was amended (operative Jan. 1, 2012) to change the reference to "Section 12034" to "Section 26100."  (Stats. 2010, ch. 711, § 5.)  In all other respects former section 12022.53(d) and the current version of section 12022.53(d) are identical. Because the post-2008 amendment of the statute does not alter our analysis, in the interest of clarity we refer here to the current version of section 12022.53(d).

## 2. *Modified version of CALCRIM No. 3149 given by the court*

During an unreported jury instruction conference, the court modified CALCRIM No. 3149─the standard jury instruction on the section 12022.53(d) firearm enhancement─and instructed the jury on that enhancement as follows:

> "If you find the defendant guilty of murder in the first or second degree in Count 1, you must then decide whether the People have proved the additional allegation that the defendant personally and intentionally discharged a firearm during that crime causing death.
>
> "To prove this allegation, the People must prove that:  [¶] 1.  The defendant personally discharged a firearm during the commission of that crime; [¶] 2.  The defendant intended to discharge the firearm; [¶] AND [¶] 3.  *The defendant's act caused the death of a person.*
>
> "The People have the burden of proving each allegation beyond a reasonable doubt.  If the People have not met this burden, you must find that the allegation has not been proved."  (Italics added.)

Thus, under the modified version of CALCRIM No. 3149 given by the court, the foregoing italicized third element (hereafter element No. 3), which the prosecution was required to prove in order to obtain a true finding on the section 12022.53(d) firearm enhancement allegation, required proof that "[t]he defendant's act[] caused the death of a person."  In modifying CALCRIM No. 3149, the court omitted from element No. 3 the bracketed phrase "who was not an accomplice to the crime."[6]  The unmodified version of

---

[6]     When Beltran committed the murder in August 2008, element No. 3 of former CALCRIM No. 3149 (like element No. 3 of the current version of CALCRIM No. 3149) included the bracketed accomplice exception and provided in part:  "To prove this allegation, the People must prove that:  [¶] 1.  The defendant personally discharged a firearm during the commission . . . of that crime; [¶] 2.  The defendant intended to discharge the firearm; [¶] AND [¶] 3.  The defendant's act caused . . . the death of . . . a person [*who was not an accomplice to the crime*]."  (CALCRIM No. 3149 (Spring 2008),

14

element No. 3, had it been given by the court, would have included the bracketed accomplice exception language and would have required proof that "[t]he defendant's act caused . . . the death of . . . a person [*who was not an accomplice to the crime*]." (CALCRIM No. 3149, italics added.)

In modifying CALCRIM No. 3149, the court also omitted the following bracketed definition of "accomplice":

> "[A person is an *accomplice* if he or she is subject to prosecution for the identical crime charged against the defendant. A person is subject to prosecution if he or she committed the crime or if: [¶] 1. He or she knew of the criminal purpose of the person who committed the crime; [¶] AND [¶] 2. He or she intended to, and did in fact, (aid, facilitate, promote, encourage, or instigate the commission of the crime/ [or] participate in a criminal conspiracy to commit the crime).]" (CALCRIM No. 3149, original italics.)

3. *Jury's finding on the section 12022.53(d) firearm enhancement allegation and the imposition of the 25-year-to-life enhancement at sentencing*

Based on the modified version of CALCRIM No. 3149 given by the court (discussed, *ante*), the jury found to be true the section 12022.53(d) firearm enhancement. As a result of that true finding, the court imposed at sentencing the consecutive indeterminate prison term enhancement of 25 years to life mandated by section 12022.53(d).

B. *Section 12022.53 and the accomplice exception to section 12022.53(d)*

Section 12022.53, which is also known as the "10–20–life" law, "was enacted in 1997 to substantially increase the penalties for using firearms in the commission of

italics added; cf. CALCRIM No. 3149 (2014).) For clarity's sake we refer to the current version of CALCRIM No. 3149.

enumerated felonies," including, as relevant here, murder. (*People v. Palmer* (2005) 133 Cal.App.4th 1141, 1148-1149; § 12022.53, subd. (a)(1) (*Palmer*).) "The statute prescribes sentence enhancements (prison terms of 10 years, 20 years, and 25 years to life) for increasingly serious circumstances of firearm use. [Citations.] Section 12022.53[(b)] requires imposition of an additional, consecutive term of 10 years when the defendant personally uses a firearm during commission of the crime. Subdivision (c) requires imposition of an additional, consecutive 20-year term when the defendant personally and intentionally discharges a firearm during commission of the crime. [Section 12022.53(d)], the provision at issue here, requires imposition of an additional, consecutive 25-year-to-life term when the defendant 'personally and intentionally discharges a firearm and proximately causes great bodily injury, as defined in Section 12022.7, or death, to any person *other than an accomplice . . . .*'" (*Palmer, supra*, 133 Cal.App.4th at p. 1149, italics added, original italics omitted; § 12022.53(d).)

Thus, under the accomplice exception set forth in section 12022.53(d), the 25-year-to-life sentence enhancement provided by section 12022.53(d) does not apply if the victim of an enumerated crime committed by the defendant was an accomplice to a crime he or she and the defendant intended to commit. (§ 12022.53(d); *People v. Flores* (2005) 129 Cal.App.4th 174, 182 (*Flores*) ["If the victim is an accomplice to the crime he or she and defendant intended but ends up the victim of one of the enumerated offenses, the [accomplice] exception in section 12022.53[(d)] applies."].)

16

C. *Analysis*

In this case substantial evidence presented at trial (discussed, *ante*, in the factual background) shows, and the Attorney General does not dispute, that Beltran shot and killed the victim—his friend and coworker, Cruz—*at Cruz's request*. The jury found Beltran guilty of second degree murder and the court imposed the challenged firearm enhancement of 25 years to life under section 12022.53(d) without instructing the jury to determine whether Cruz was an accomplice to the crime.

The principal question we must decide is whether Cruz was an "accomplice" to the murder within the meaning of the accomplice exception set forth in section 12022.53(d). Under the accomplice exception, as already discussed, the 25-year-to-life sentence enhancement provided by section 12022.53(d) applies only if the defendant, in discharging a firearm during his or her commission of an enumerated offense (here, murder), proximately caused great bodily injury or (as occurred here) death to someone "other than an accomplice." (§ 12022.53(d); *Flores*, *supra*, 129 Cal.App.4th at p. 182.) Thus, if—as Beltran contends—Cruz was an accomplice to his own murder because he asked Beltran to kill him, the accomplice exception to the section 12022.53(d) firearm enhancement applies and we must conclude both that the court erroneously modified CALCRIM No. 3149 by omitting the accomplice exception language ("other than an accomplice") that would have required the jury to determine whether Cruz was an accomplice and that the court erroneously imposed the 25-year-to-life sentence enhancement under section 12022.53(d). If Cruz was not an accomplice, as the Attorney General contends, we must conclude both that the court properly gave to the jury the

17

modified version of CALCRIM No. 3149 (discussed, *ante*), and that it properly imposed the firearm enhancement under section 12022.53(d).

Our analysis hinges on the legal definition of "accomplice." As this court explained in *People v. Verlinde* (2002) 100 Cal.App.4th 1146, "[a]ccomplice liability is "'derivative,'" resulting from an act by the perpetrator to which the accomplice contributed." (*Id.* at p. 1158, quoting *People v. Prettyman* (1996) 14 Cal.4th 248, 259.) "Put another way, "'[a]n accomplice" is one who knowingly, voluntarily, and with common intent with the principal offender unites in the commission of the crime.'" (*Verlinde* at p. 1158, quoting *People v. Jones* (1967) 254 Cal.App.2d 200, 213.)

However, for a person to be an accomplice it is not sufficient that he or she knowingly, voluntarily, and with common intent with the principal offender unites in the commission of the crime. The California Supreme Court has explained that "[s]ection 1111[7] defines a[n] accomplice as a person 'who is *liable to prosecution* for the identical offense charged against the defendant on trial [and] that [t]his definition encompasses all principals to the crime [citation], including aiders and abettors and coconspirators." (*People v. Stankewitz* (1990) 51 Cal.3d 72, 90, italics added.) Thus, in order to be an accomplice, a person also "'must be *chargeable* with the crime as a principal (§ 31) . . . .'" (*Verlinde*, *supra*, 100 Cal.App.4th at p. 1158, quoting *People v. Sully* (1991) 53 Cal.3d 1195, 1227, italics added; § 1111.) "Whether a person is an accomplice is a question of

---

7    Section 1111 provides in pertinent part:  "An accomplice is hereby defined as one who is *liable to prosecution* for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given."  (Italics added.)

18

fact for the jury unless there is no dispute as to either the facts or the inferences to be drawn therefrom." (*Stankewitz,* at p. 90.)

Beltran, however, disputes that in order to be deemed an "accomplice" within the meaning of section 12022.53(d), a person must be chargeable with a crime. Specifically, he asserts that Cruz "was an 'accomplice' to his own murder *whether or not he could be charged with a crime*." (Italics added.) Correctly noting that section 1111 "is a very old statute from 1872" (see 50B West's Ann. Pen. Code (2004 ed.) foll. § 1111, p. 383) and that section 12022.53 "was added in 1997" (see *Palmer, supra,* 133 Cal.App.4th at p. 1148), Beltran also asserts that, "[h]ad the Legislature in enacting Section 12022.53 meant for the definition of an accomplice to be that of Section 1111, it would have said so." These assertions are without merit. As Beltran himself acknowledges, it is an established rule of statutory construction that "the Legislature is deemed to be aware of statutes . . . already in existence and to have enacted a statute in light of existing statutes and decisions." (*People v. Kelly* (2013) 215 Cal.App.4th 297, 305, citing *People v. Yartz* (2005) 37 Cal.4th 529, 538.) Thus, when the Legislature enacted section 12022.53 in 1997, it presumably was aware of the definition of accomplice set forth in section 1111, an existing statute. Accordingly, we presume that if the Legislature in enacting section 12022.53 had intended that the definition of accomplice set forth in section 1111 *not* apply, it would have said so. (*Yartz, supra,* 37 Cal.4th 529 at p. 538; *Kelly, supra,* 215 Cal.App.4th at p. 305.)

Turning to the undisputed facts of this case, we conclude that Cruz was *not* an accomplice to his own murder within the meaning of the accomplice exception set forth

19

in section 12022.53(d) as a matter of law, and thus the court did not err in modifying CALCRIM No. 3149 and in imposing the 25-year-to-life firearm enhancement under section 12022.53(d), because Cruz could not have been lawfully charged with any crime, including attempted murder, had he survived the shooting perpetrated by Beltran at Cruz's request. "Murder is the unlawful killing of *another* human being . . . with malice aforethought." (1 Witkin & Epstein, Cal. Criminal Law (4th ed. 2012) Crimes Against the Person, § 97, p. 887, italics added; CALCRIM No. 500 [stating in part that "[h]omicide is the killing of one human being by another" and murder is a type of homicide].) Thus, had Cruz survived the shooting, he would not have been chargeable as an accomplice to attempted murder because he was not liable to prosecution for his own unlawful killing. (1 Witkin & Epstein, Cal. Criminal Law, *supra*, § 97. p. 887; CALCRIM No. 500; see *In re Joseph G.* (1983) 34 Cal.3d 429, 433 ["[M]ost [American jurisdictions], including California, attach no criminal liability to one who makes a suicide attempt."]; *In re Ryan N.* (2001) 92 Cal.App.4th 1359, 1373 ["Neither suicide nor attempted suicide is a crime under the criminal statutes of California or any other state."])

Beltran's reliance on *Flores*, *supra*, 129 Cal.App.4th 174, is unavailing. In that case the defendant (Flores) and a fellow gang member (Valdivia) conspired to commit a battery on a rival gang member (Morales). (*Id.* at p. 182.) While Valdivia was fighting with Morales during a gang brawl, Flores shot at Morales with a firearm but hit and killed Valdivia. (*Ibid*.) The prosecution charged Flores with the murder of Valdivia and alleged that Flores's sentence should be enhanced under the then-existing version of section 12022.53(d) that, like the version of section 12022.53(d) at issue in this case,

20

applied only if the victim of the defendant's enumerated crime was someone "other than an accomplice."[8] (*Flores*, at p. 181.) Like the court in the instant case, the trial court in *Flores* failed to include the words "other than an accomplice" when it instructed the jury on the section 12022.53(d) firearm enhancement. (*Flores*, at pp. 177, 181.) A jury found Flores guilty of the first degree murder of Valdivia and also found to be true the section 12022.53(d) enhancement allegation. (*Flores*, at p. 180.) At sentencing, the trial court imposed the 25-year-to-life sentence enhancement provided by section 12022.53(d). (*Ibid.*)

On appeal, the *Flores* court held that when the trial court struck the words "other than an accomplice" from the jury instruction on the section 12022.53(d) enhancement, it erroneously "withdrew from the jury the opportunity to consider whether Valdivia was an accomplice to defendant's discharge of the firearm either as an aider and abettor or as a coconspirator." (*Flores*, *supra*, 129 Cal.App.4th at p. 183.) Observing that "[t]he Legislature [in enacting section 12022.53(d)] apparently decided that killing one's accomplice is less blameworthy (or at least less deserving of punishment) than killing a nonaccomplice" (*Flores*, at p. 181), the Court of Appeal reasoned that, "[h]ad [Flores's] shot hit only Morales or Morales and some other person" (*ibid.*)—in other words, had the

---

8    The former version of section 12022.53(d) at issue in *Flores* provided: "'Notwithstanding any other provision of law, any person who is convicted of a felony specified in subdivision (a), . . . and who in the commission of that felony intentionally and personally discharged a firearm and proximately caused . . . death[] to any person *other than an accomplice*, shall be punished by a term of imprisonment of 25 years to life in the state prison, which shall be imposed in addition and consecutive to the punishment prescribed for that felony.'" (*Flores*, *supra*, 129 Cal.App.4th at p. 181, original italics.)

murder victim, Valdivia, survived─Valdivia "would surely have been charged as a coconspirator and an aider and abettor of defendant's crimes, i.e., an *accomplice*." (*Ibid*., italics added.) The *Flores* court explained that, "[i]f the victim is an accomplice to the crime he or she and defendant intended but ends up the victim of one of the enumerated offenses, the exception in section 12022.53[(d)] applies." (*Flores,* at p. 182.)

Beltran's reliance on *Flores* is unavailing because that case is distinguishable. The murder victim in *Flores* was an accomplice for purposes of section 12022.53(d) because, had he survived the shooting, he would have been liable to prosecution as an aider and abettor, and as a coconspirator, for the crime he and the defendant intended to commit. Here, as already discussed, Cruz would not have been liable to prosecution as an accomplice for the crime he asked Beltran to commit: his own unlawful killing.

For all of the foregoing reasons, we affirm the 25-year-to-life sentence that the court imposed on Beltran under section 12022.53(d).

DISPOSITION

The judgment is affirmed.

NARES, J.

WE CONCUR:

BENKE, Acting P. J.

McDONALD, J.